**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 2 3 2023

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

| | |
|---|---|
| THE CHRISTIAN MINISTERIAL ALLIANCE, PATRICA BREWER, CAROLYN BRIGGS, LYNETTE BROWN, and MABLE BYNUM, on behalf of themselves and all other similarly situated persons,<br><br>        Plaintiffs,<br><br>    v.<br><br>JOHN THURSTON, in his official capacity as the Secretary of State of Arkansas, and SHARON BROOKS, JAMES HARMON SMITH, III, BILENDA HARRIS-RITTER, WENDY BRANDON, WILLIAM LUTHER, AND JAMIE CLEMMER in their official capacities as members of the Arkansas State Board of Election Commissioners,<br><br>        Defendants. | CIVIL ACTION<br><br>Case No. 4:23 - cv - 471 - DPM<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF PURSUANT TO 42 U.S.C. § 1983 AND 28 U.S.C. § 1331**<br><br>**REQUEST FOR THREE-JUDGE PANEL (28 U.S.C. § 2284)**<br><br><br>This case assigned to District Judge _Marshall_<br>and to Magistrate Judge _Ervin_ |

**TABLE OF CONTENTS**

<strong>Page</strong>

PRELIMINARY STATEMENT ................................................................. 1

PARTIES ........................................................................................ 8

JURISDICTION AND VENUE ............................................................ 12

CONGRESSIONAL REDISTRICTING BACKGROUND ........................... 13

GROWING BLACK ELECTORAL IMPACT IN THE SECOND CONGRESSIONAL DISTRICT, 2010-2020 ............... 14

THE EVENTS SURROUNDING THE ENACTMENT OF THE 2021 REDISTRICTING PLAN ........................................ 18

    The Plan Is Introduced Via an Unusual Eleventh-Hour Substitution and Rushed to Enactment, As Legislators Question the Irregular Process .............. 18

    The 2021 Congressional Redistricting .......................................... 22

    Legislative Proponents of the 2021 Redistricting Plan Knew They Were Targeting Black Voters, and Were Repeatedly Reminded That the Consequence of This Cracking Would Be Diminished Political Opportunity for Black Voters ........ 24

    Proponents Give False, Pretextual Reasons for Refusing to Discuss the Known Racially Discriminatory Targeting and Other Harms of the Plan When Called to Their Attention ................................................................ 29

THE SECOND CONGRESSIONAL DISTRICT IN THE 2021 REDISTRICTING PLAN IS A RACIAL GERRYMANDER ................................................. 30

    The 2021 Redistricting Plan Divides Political Subdivisions and Fragments Black Communities of Interest in Pulaski County Without Justification ............ 31

    Traditional Redistricting Principles Call for Maintenance of Political Subdivisions and Communities of Interest .......................................... 36

    Arkansas Legislators' Stated Goal in the 2021 Redistricting Was Not to Split Political Subdivisions Like Counties .................................... 38

    In Creating the Second Congressional District, the 2021 Redistricting Plan Subordinates Traditional Redistricting Principles and the Legislators' Own Stated Intent Not to Split Political Subdivisions Like Counties .................. 39

    Desire for Partisan Advantage Cannot Explain the 2021 Redistricting Plan ........ 45

THE 2021 REDISTRICTING PLAN HAS THE HALLMARKS OF INTENTIONAL RACIAL DISCRIMINATION ....................................................... 46

    The Arlington Heights Decision Sets Out Factors Evidencing Racially Discriminatory Intent Or Purpose ................................................ 46

    Additional Facts Bearing on the Arlington Heights Test for Discriminatory Intent Or Purpose ...................................................................... 47

        The Plan Bears More Heavily on One Race ............................... 47

i

The Specific Sequence of Events Leading Up to the Challenged Decision Supports a Finding of Discriminatory Intent ............................ 48

The Legislature Departed from Normal Procedure and Substance ......... 48

The Legislative History and Contemporaneous Statements of Legislators Support a Finding of Discriminatory Intent ......................... 49

Arkansas Has a History of Racial Discrimination .................................. 49

FIRST CAUSE OF ACTION ............................................................................. 52

SECOND CAUSE OF ACTION ........................................................................ 53

PRAYER FOR RELIEF .................................................................................... 54

CERTIFICATE OF SERVICE .......................................................................... 57

Plaintiffs, The Christian Ministerial Alliance, Patricia Brewer, Carolyn Briggs, Lynette Brown, and Mable Bynum, for their Complaint for Injunctive and Declaratory Relief allege as follows:

## PRELIMINARY STATEMENT

1.      Race was the predominant factor in creating Arkansas's Second Congressional District in the 2021 Redistricting Plan (the "Plan"), intentionally singling out Black voters for unequal treatment and dilution of their electoral power.  This violates the Fourteenth and Fifteenth Amendments to the United States Constitution.

2.      Fewer than 16,510 residents needed to be moved out of Arkansas's Second Congressional District to achieve one person, one vote parity after the 2020 Census.  To achieve its unconstitutional purpose, however, the 2021 Redistricting Plan moved over 41,000 residents in portions of Pulaski County resided in by heavy concentrations of Black people out of the Second Congressional District and replaced that population with approximately 25,000 people from overwhelmingly white Cleburne County.  To make this white-for-Black population swap possible, the 2021 Redistricting Plan carved Pulaski County into not two but *three* separate Congressional Districts with boundary lines that disregarded traditional redistricting principles such as respect for political subdivisions and sliced through the heart of longstanding Black communities of interest in the Second Congressional District with almost surgical precision.  These changes fundamentally altered the overall racial demographics of the Second Congressional District.

3.      Before they passed the 2021 Redistricting Plan, Arkansas legislators were repeatedly warned that Black individuals were being targeted for movement out of the Second Congressional District and the serious ramifications that it would have for Black voters' representational access and electoral opportunity.  At least one proponent of the Plan acknowledged she was aware of these effects.  Other proponents of the Plan largely refused to

engage with these criticisms, offering the false pretexts that they should not consider race for any reason while debating the merits of the Plan. And they did not offer any credible explanation of why non-racial criteria necessitated these obvious harms to the Black community.

4.      In creating the current Second Congressional District, the 2021 Redistricting Plan contravenes traditional redistricting principles, the principles set forth by the Arkansas Board of Apportionment, and Arkansas legislators' own stated redistricting goals by splitting counties and other political subdivisions, and communities of interest.

5.      Slicing through the heart of Pulaski County's large and politically effective Black community in the Second Congressional District, the 2021 Redistricting Plan divides the county's Black voting population anchored in the Second Congressional District into three of Arkansas's four congressional districts.

6.      This drastic and unprecedented decision divides and dilutes the power of the state's largest community of Black voters. By spreading Pulaski County's Black voters across the First, Second, and Fourth Congressional districts, the 2021 Redistricting Plan ensures that Black people constitute no more than approximately one-fifth of the voting-age population ("VAP") in any one district, particularly the Second Congressional District where Black voters have demonstrated growing electoral influence.

7.      This is a textbook case of "cracking" a minority community to suppress its political voice. And this cracking is intentional.

8.      The 2021 Redistricting Plan excises fourteen voting precincts in southeastern Pulaski County that had long been included with the rest of Pulaski County in the Second Congressional District. Nearly all of these precincts comprised predominantly Black voters.

2

9.      Specifically, Black voters were the largest demographic group—either a majority or plurality—in twelve of these fourteen precincts.  And ten of the fourteen precincts fall completely or partially within what is commonly known as a "Hunt District"—a judicial subdistrict created by a federal consent decree to provide Black electoral opportunity in areas where Black voters are sufficiently numerous and geographically compact to create such districts, but where recognized patterns of racial bloc voting otherwise deprive Black voters of any opportunity to elect candidates of choice.

10.     Overall, Black people made up more than half the VAP in the areas of southeastern Pulaski County that were excised from the Second Congressional District.  By contrast, white voters made up less than a third of the VAP of these targeted precincts.

11.     The timing of this unprecedented action, which effectively eliminated the voice of Black voters in the Second Congressional District, was no coincidence.

12.     In its entire history, Arkansas has never elected a Black person to Congress.  But in recent years, as its Black VAP has grown and its white VAP has shrunk, legislative decisionmakers have come to recognize that Pulaski County is a unique area of the state where Black voters have increasingly demonstrated the potential to shape the outcome of electoral contests.  Pulaski County is the most racially diverse county in the state and the county with the single largest Black population. In recent years, Black candidates have prevailed in local races both countywide and in the city of Little Rock.

13.     In 2020, with overwhelming support from Black voters in Pulaski County, Black State Senator Joyce Elliott came close to prevailing in the Second Congressional District against white incumbent Representative French Hill.  That was the last contest held under the old congressional district lines, with an undivided Pulaski County as the core of the Second Congressional District.

3

14.    The competitive contest between Senator Elliott and incumbent Representative Hill was fresh in the Arkansas Legislature's mind when it crafted the Second Congressional District and adopted the 2021 Redistricting Plan less than a year later.

15.    Moreover, the legislative process by which the 2021 Redistricting Plan was enacted bears hallmarks of intentional racial discrimination.

16.    The 2021 Redistricting Plan first appeared as a late-night, late-in-the-process substitution for a different proposed plan and was belatedly introduced only after other plans had been subject to days of public scrutiny and legislative debate that the 2021 Redistricting Plan thereby avoided.

17.    From the start, the racialized nature of the 2021 Redistricting Plan was readily apparent and known to its sponsors. The white proponents of the Plan were fully aware that Black voters would bear the brunt of their unprecedented three-way split of Pulaski County anchored in the Second Congressional District. That was true both because (i) they received and were presented with publicly-available racial demographic data that made clear the Plan's effects on Black voters, and (ii) anyone familiar with longstanding patterns of de facto residential segregation in Pulaski County—encompassing Arkansas's legislative capitol in Little Rock—would have known what effect the Plan would have on Black voters.

18.    Moreover, in the fewer than 72 hours that it took to rush the 2021 Redistricting Plan through the Legislature, the Plan's proponents were warned by legislators opposed to the Plan, as well as at least one individual and organization, that the Plan singled out Black voters (and other voters of color) for discriminatory treatment and electoral harm. In response, the white legislators who supported the bill did not dispute these obvious features of their plan, such as the trisecting of Pulaski

County and excision of fourteen predominantly Black precincts. Nor did the majority of proponents of the bill even attempt to justify their actions as compelled by traditional redistricting principles.

19.     And what little response white legislator proponents did offer was pretextual: they largely refused to acknowledge or discuss the racial impacts of their plan and falsely claimed that even discussing the Plan's racial impacts was impermissible.  The Plan's supporters used these pretextual responses to shield them from having to justify, explain, or even discuss their unconstitutional racial motives.

20.     But the proponents of the 2021 Redistricting Plan ultimately could not deny the racialized nature of the changes to the Second Congressional District, which created racial disparities that were obvious and highlighted for them during the truncated debate prior to the Plan's enactment. One of the bill's sponsors, upon being confronted with statistics showing the extreme racial disparities caused by the proposed changes to the Second Congressional District—and upon being warned that these changes would single out Black voters and other voters of color in Pulaski County for harm— admitted that she did not "disagree with a lot" of those warnings.[1]

21.     In addition, traditional redistricting principles cannot explain the targeting of Pulaski's Black voters.  Redistricting practices in Arkansas and elsewhere disfavor splitting counties and other political subdivisions.  Yet the 2021 Redistricting Plan's treatment of Black voters in Pulaski County violates that principle on multiple levels: splitting the county three ways, dividing multiple municipalities, carving up a (predominantly Black) judicial subdistrict, and even dividing all four of the major public school districts in Pulaski County—one of which now

---

[1] Senate Committee on State Agencies and Governmental Affairs (PM Session), at 3:17:45–3:18:10         PM         (Oct.         5,         2021),         https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20211005/-1/21881?gefdesc=&startposition=20211005150241#agenda_  [hereinafter Oct. 5, 2021 Senate Committee on State Agencies and Governmental Affairs (PM Session)].

occupies parts of three different congressional districts. Traditional redistricting principles also disfavor dividing communities of interest; yet the 2021 Redistricting Plan means that Black neighbors, churchgoers, classmates, and coworkers living in close proximity will have different representation in three different Congressional districts. And none of this was necessary—other plans were introduced that fared markedly better on traditional criteria such as respect for political subdivisions.

22.    Pursuit of any partisan advantage or monopoly cannot explain what happened here, either. Other plans could have fulfilled partisan goals without singling out Black voters to such a degree. Black and white voters with the same party preferences based on the 2018 and 2022 gubernatorial elections, particularly in and around Pulaski County, were sorted differently among the relevant districts. Race, not merely party, drove who remained in the Second Congressional District and who was cut out.

23.    The 2021 Redistricting Plan was enacted amid bipartisan concern over its discriminatory treatment of communities of color. Governor Asa Hutchinson refused to sign the 2021 Redistricting Plan despite its having been introduced and supported by his own political party, and instead allowed it to take effect without his signature. In so doing, Governor Hutchinson emphasized that he was "concerned about the impact of the redistricting plan on minority populations," and specifically noted that "the removal of minority areas in Pulaski County into two different districts raises concerns."[2] Governor Hutchinson publicly expressed his concerns both before and after the Plan was enacted.

---

[2] *Governor Hutchinson Allows Vaccine Mandate, Redistricting Bills to Become Law Without His Signature*, Off. Website of the State of Ark. (Oct. 13, 2021), https://directory.arkansas.gov/agency/governors-office/news/governor-hutchinson-allows-vaccine-mandate-redistricting-bills-to-become-law-without-his-

24.     Those concerns were well founded.  The 2021 Redistricting Plan is unconstitutional under the Fourteenth and Fifteenth Amendments for at least two reasons.

25.     First, the Second Congressional District in the 2021 Redistricting Plan is an unconstitutional racial gerrymander in violation of the Fourteenth Amendment.  Race motivated the sorting of voters among the First, Second, and Fourth congressional districts, and those racial considerations predominated over traditional redistricting principles.  For example, the 2021 Redistricting Plan needlessly cuts through political subdivision boundaries and cracks longstanding communities of interest in order to carve out of the Second Congressional District areas serving predominantly Black voters.  No non-racial motive explains these decisions, and no compelling interest, such as compliance with Section 2 of the Voting Rights Act, justifies them.

26.     Second, the 2021 Redistricting Plan intentionally discriminates against Black voters by reducing their emerging electoral power in the Second Congressional District in violation of the Fourteenth and Fifteenth Amendments.  The Plan causes discriminatory harm to Black voters that is stark and unmistakable, including via the targeted dividing of areas resided in by predominantly Black voting populations within Pulaski County.  The Plan was enacted in response to growing Black political power in Pulaski County anchored in the Second Congressional District.  The legislative process leading to the Plan's enactment was irregular, and rife with pretextual responses from the Plan's white legislative proponents.  And Arkansas has a long and judicially recognized record of official discrimination in voting harming Black voters that continues into the present.  Those are all hallmarks of unconstitutional intentional discrimination.

---

signature/#:~:text=%E2%80%9CI%20am%20concerned%20about%20the%20impact%20of%20the,Pulaski%20County%20into%20two%20different%20districts%20raises%20concerns.

27.    Accordingly, Plaintiffs respectfully request that this Court: (1) declare that the Second Congressional District adopted under the 2021 Redistricting Plan constitutes a racial gerrymander in violation of the Fourteenth Amendment to the U.S. Constitution; (2) declare that the 2021 Redistricting Plan was passed with a discriminatory intent to dilute Black voters' political power in the Second Congressional District in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution; (3) enjoin Defendants from enforcing or giving any effect to the boundaries of the Second Congressional District in the 2021 Redistricting Plan, including enjoining Defendants from calling, holding, supervising, or certifying any elections under the 2021 Redistricting Plan until a constitutionally compliant remedial plan is adopted for elections beginning in 2024; and (4) enjoin Defendants from calling, holding, supervising, or certifying any elections under the current configuration of Arkansas's U.S. congressional districts until a constitutionally compliant remedial plan that corrects the racial gerrymander and unconstitutional race-based vote dilution in the Second Congressional District is adopted for elections beginning in 2024.

## PARTIES

28.    Plaintiff the **Christian Ministerial Alliance** is a non-profit, non-partisan interfaith coalition of religious leaders from Pulaski County and neighboring areas founded in 1968—just three years after Congress enacted the Voting Rights Act.  It is devoted to furthering racial equality and justice in Arkansas, and to that end, has supported litigation to protect minority voting rights, including *Hunt v. Arkansas*, No. PB-C-89-406, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991) (challenging the dilution of Black voting strength caused by the method of electing Arkansas's trial court judges).

29.    The Christian Ministerial Alliance's membership includes Black registered voters who reside in the current Second Congressional District, and Black registered voters who were

moved from the Second Congressional District to the First and Fourth Congressional Districts in the 2021 Redistricting Plan. These members suffered harm because they were subjected to race-based redistricting without adequate justification in violation of their constitutional rights. Members also no longer live in a district (*i.e.*, the Second Congressional District) in which they have an equal opportunity to elect candidates of their choice as their representatives or otherwise meaningfully impact congressional elections.

30.    Plaintiff **Patricia Brewer** is a Black resident of Pulaski County and a registered voter in the Second Congressional District. Her North Little Rock address, where she has lived for 58 years, was previously within the Second Congressional District under the 2011 congressional map and remains in the Second Congressional District under the 2021 Redistricting Plan. Mrs. Brewer is a U.S. citizen and Black Arkansas voter who seeks a meaningful vote to support candidates who she believes would best serve Arkansas's Black individuals and communities, and who she believes would be responsive to issues impacting Black people—such as access to disaster relief, improved infrastructure, school funding, environmental protections, and more. Mrs. Brewer attended a rally at the state capitol to urge elected officials to adopt fair maps that would not harm Black Pulaski County voters by weakening the power of their vote. The 2021 Redistricting Plan disincentivizes congressional candidates in the Second Congressional District to appeal for Mrs. Brewer's vote given the dilutive design of the district. As alleged herein, elected officials harmed Mrs. Brewer by using race as the predominant factor motivating their decisions to place a significant number of voters, like Mrs. Brewer, within or outside of the Second Congressional District. Mrs. Brewer is further harmed by the 2021 Redistricting Plan's intentional dilution of Black voting power anchored in Pulaski County in the Second Congressional District.

31.     Plaintiff **Mable Bynum** is a Black resident of Pulaski County and a registered voter in the Second Congressional District.  Her address, where she has lived for 54 years, was within the Second Congressional District under the 2011 congressional map and remains in the Second Congressional District under the 2021 Redistricting Plan.  Ms. Bynum is a U.S. citizen and Black Arkansas voter who seeks a meaningful vote to support candidates who would support Pulaski County's Black population and communities.  The 2021 Redistricting Plan disincentivizes congressional candidates in the Second Congressional District to appeal for Ms. Bynum's vote given the dilutive design of the district.  As alleged herein, elected officials harmed Ms. Bynum by using race as the predominant factor motivating their decisions to place a significant number of voters, like Ms. Bynum, within or outside of the Second Congressional District.  Ms. Bynum is further harmed by the 2021 Redistricting Plan's intentional dilution of Black voting power, anchored in Pulaski County in the Second Congressional District.

32.     Plaintiff **Carolyn Briggs** is a Black resident of Pulaski County and a registered voter in the First Congressional District.  Mrs. Briggs has lived at her North Little Rock, Pulaski County residence for seven years.  Mrs. Briggs was within and voted in the Second Congressional District under the 2011 congressional map.  But under the new lines drawn by the 2021 Redistricting Plan, Mrs. Briggs is now within the First Congressional District.  Mrs. Briggs is a U.S. citizen and Black Arkansas voter who seeks a meaningful vote to support candidates who she believes would best serve Arkansas's Black individuals and communities.  The 2021 Redistricting Plan makes it less likely that Congressional candidates will appeal for Mrs. Briggs's vote given the dilutive changes to the Second Congressional District, as she is now submerged in a District with a super-majority of white voters and population centers that are far from her home.  As alleged herein, elected officials harmed Mrs. Briggs by using race as the predominant factor motivating

their decisions to place a significant number of voters, like Mrs. Briggs, within or outside of the Second Congressional District. Mrs. Briggs is further harmed by the 2021 Redistricting Plan's intentional dilution of Black voting power, anchored in Pulaski County in the Second Congressional District.

33. Plaintiff **Lynette Brown** is a Black resident of Pulaski County and a registered voter in the First Congressional District. Ms. Brown has lived at her current North Little Rock, Pulaski County residence for 17 years and has lived in North Little Rock for nearly her entire life. Ms. Brown was within and voted in the Second Congressional District under the 2011 congressional map. But under the new lines drawn by the 2021 Redistricting Plan, Ms. Brown is now within the First Congressional District. Ms. Brown is U.S. citizen and Black Arkansas voter who seeks a meaningful vote to support candidates who she believes would best serve Arkansas's Black individuals and communities in the North Little Rock area, particularly in adopting policies that encourage business development for those communities. The 2021 Redistricting Plan makes it less likely that Congressional candidates will appeal for Ms. Brown's vote given the dilutive changes to the Second Congressional District, as she is now submerged in a District with a super-majority of white voters and population centers that are far from her home. As alleged herein, elected officials used race as the predominant factor motivating their decisions to place a significant number of voters, like Ms. Brown, within or outside of the Second Congressional District. Ms. Brown is further harmed by the 2021 Redistricting Plan's intentional dilution of Black voting power, anchored in Pulaski County in the Second Congressional District.

34. Defendant **John Thurston** is the Arkansas Secretary of State and is named in his official capacity. Secretary Thurston is Arkansas's chief election official and is responsible for administering and directing the state's elections and implementing election laws and regulations,

including the 2021 Redistricting. *See* Ark. Const. amend. 51, § 5. Secretary Thurston is the Chair

and the Secretary of the State Board of Election Commissioners. *See* Ark. Admin. Code 108.00.11-

1101(3); *see also* Ark. Code Ann. § 7-4-101(b) (West, Westlaw through 2023 Reg. Sess.).

35.    Defendants **John Thurston**; **Sharon Brooks**; **James Harmon Smith, III**; **Bilenda**

**Harris-Ritter**; **Wendy Brandon**; **William Luther**; and **Jamie Clemmer**, named in their official

capacities, are members of the Arkansas State Board of Election Commissioners, an agency of

Arkansas government composed of seven appointed commissioners and staff. The Arkansas

"[L]egislature has empowered the board to enforce election laws," including the 2021 Redistricting

Plan. Ark. Admin. Code 108.00.11-1101(2).

## JURISDICTION AND VENUE

36.    This action arises under the Fourteenth and Fifteenth Amendments to the U.S.

Constitution.

37.    This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983, 28 U.S.C.

§§ 1331 and 1343(a)(3), and 42 U.S.C. § 1988.

38.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant

to 28 U.S.C. §§ 2201, 2202, and 2284, Rules 57 and 65 of the Federal Rules of Civil Procedure,

and the general legal and equitable powers of this Court.

39.    Pursuant to 28 U.S.C. § 2284(a), this case must be heard and determined by a

district court of three judges because this action challenges "the constitutionality of the

apportionment of congressional districts."

40.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events

or omissions giving rise to Plaintiffs' claims occurred in this judicial district and the majority of

the Defendants, who are sued in their official capacities, carry out their official duties at offices

located in this district.

41.    This Court has personal jurisdiction over Defendants, who are sued in their official capacities as state officials.  The violations asserted concern their conduct in such capacities.

## CONGRESSIONAL REDISTRICTING BACKGROUND

42.    The United States Constitution requires that congressional districts be redrawn at least once every decade, using new Census data to equalize population across single-member districts.

43.    "States must draw congressional districts with populations as close to perfect equality as possible." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016); *see also Karcher v. Daggett*, 462 U.S. 725, 730–31 (1983).

44.    In Arkansas, congressional district maps are initially drawn and passed by the state General Assembly, requiring a simple majority vote in both houses.

45.    Legislators in the House and Senate of the General Assembly introduce bills that set forth proposed congressional district maps.  Under Arkansas law, the House and Senate Committees on State Agencies and Governmental Affairs review "election laws and procedures," including congressional redistricting proposals.  Ark. Code Ann. § 10-3-203 (West, Westlaw through 2023 Reg. Sess.).  The Committees meet to hold hearings and consider various bills and map proposals, ultimately reporting out bills for consideration by the full House and Senate.

46.    Once a bill is passed by the chamber in which it was introduced, it is sent to the other chamber for committee consideration, possible amendment, and a floor vote.  If the other chamber passes the bill, it returns—with any new amendments—to its original chamber for approval.  If approved by the original chamber, the bill is then enrolled and delivered to the Governor.

47.    The Governor then has an opportunity to either sign the bills into law, veto them, or allow them to become law without his signature.

13

48.     During a legislative session, the Governor has five days to veto a bill before it becomes law without the Governor's signature. If the Legislature has adjourned, the Governor has 20 days to veto a bill; otherwise, it becomes law without the Governor's signature.

49.     From 2011 to 2021, Arkansas had four Congressional districts, drawn based on the results of the 2010 Census.

50.     On September 16, 2021, the U.S. Census Bureau released data from the 2020 Census.

51.     Those data showed that the population of Arkansas had increased by approximately 95,606 since 2010.

52.     This increase was concentrated mainly in the Second and Third Congressional Districts.

53.     Based on the state's population growth over the past decade, each of Arkansas's four congressional districts in the 2021 Redistricting Plan needed an ideal population of 752,881 people.

54.     According to the 2020 Census, the population of Arkansas's then-existing Second Congressional District was 769,391. That was 16,510 more than the ideal population.

55.     Therefore, only approximately 16,510 persons needed to be moved out of the Second District during the 2021 Redistricting in order to comply with the equal-population requirements of the Constitution.

## GROWING BLACK ELECTORAL IMPACT IN THE SECOND CONGRESSIONAL DISTRICT, 2010-2020

56.     From 2011 to 2021, the Second Congressional District was comprised of seven whole counties in the center of the state. At the time of the 2010 Census, the total population for

14

the seven counties that made up the Second Congressional District from 2011 to 2021 was 729,192 people, of whom approximately 70.3% identified as white[3] persons and 22.3% as Black[4] persons.

57.    The heart of the Second Congressional District before 2021 was Pulaski County, the home of Arkansas's capital city of Little Rock and the most populous county in the state. Pulaski County accounted for 52.5% of the population of the Second District from 2011 to 2021, based on 2010 data. The city of Little Rock alone accounted for 26.5% of the Second District's total population from 2011 to 2021.

58.    Pulaski County is home to the largest Black population in Arkansas. Black people make up 36.1% of Pulaski County's total population. It is the most diverse county in the state, and has the highest number of Black residents of any Arkansas county at approximately 143,950. The city of Little Rock is home to a population of 202,251 people, of which 82,206 people (approximately 40.6% of the population) are Black persons.

59.    The entirety of Pulaski County has historically been contained within the Second Congressional District.

60.    Within Pulaski County, the Black population predominantly lives in the southern and eastern portions of the county, with the highest concentration of Black people living in southeast Little Rock. Other parts of the county are predominantly white and have relatively fewer Black residents.

61.    Between 2010 and 2020, the total population of Arkansas's Second Congressional District increased by 5.5% to 769,391. During this time period, the total Black population of the

---

[3] For purposes of this Complaint, "white" refers to white persons, not including Hispanic persons, using 2020 Census data.
[4] For purposes of this Complaint, "Black" refers to Black persons alone or in combination with another racial group using 2020 Census data.

Second Congressional District increased by 15.8 % to 188,021, while the total white population declined by 5.0% to 487,210.

62.    Between the 2010 and 2020 Censuses, the total population of Pulaski County increased by 4.4% (16,964 people) to 399,125. During this time period, the Black population of Pulaski County increased by 10% (13,822 people) to 151,682, while the white population declined by 8.4% (17,704 people) to 193,993.

63.    VAP is a subset of total population and refers to the number of people aged 18 or older residing within a geographical area.

64.    Between 2010 and 2020, the VAP of the Second Congressional District increased by 7.2 % (40,011 people) to 593,620.  During this time period, the Black VAP of the Second Congressional District increased by 21.4% (23,661 people) to 134,409, while the white VAP decreased 3.1% (12,605 people) to 393,757.

65.    Between 2010 and 2020, the Black VAP of Pulaski County increased significantly, while the white VAP of the county declined.  Specifically, the overall VAP of Pulaski County increased by 6.5% (19,015 people) to 309,578.  The Black VAP of Pulaski County increased by 16.2% (15,310 people) to 109,903.  The VAPs of other non-white voters also increased.  Meanwhile, the white VAP decreased by 6.3% (10,908 people) to 162,295.

66.    Over the last decade, Black candidates made inroads in elections in Pulaski County with the benefit of robust support from Black voters.

67.    The growing influence of this Black electorate resulted in several landmark victories for Black candidates in the last few years before the 2020 Census and 2021 Redistricting. In 2018, the city of Little Rock elected Frank Scott, Jr., the city's first elected Black mayor in the

200 years since its founding. The 2018 election cycle also saw the election of Pulaski County's first Black County Sheriff, Eric Higgins, and its first Black County Clerk, Teri Hollingsworth.

68. This emerging political impact of Black voters in the immediate Pulaski County area has not yet translated to Black electoral success in statewide or Congressional contests.

69. Indeed, Arkansas is the only former Confederate state that has never elected a Black person to Congress. And no Black person from Arkansas has ever been elected to the U.S. Senate or to the Arkansas statewide elected offices of Governor, Lieutenant Governor, Chief Justice or Associate Justice of the Supreme Court, Secretary of State, Treasurer, Auditor, or Land Commissioner.

70. However, in 2020, a Black candidate appeared to come within striking distance of breaking through this wall of exclusion in the Second Congressional District. Arkansas State Senator Joyce Elliott, a Black woman, ran for Congress in the Second District. She came close to becoming Arkansas's first Black Congressional representative, due in significant part to Black voter support in Pulaski County. In fact, Senator Elliott came closer to being elected than any Black congressional candidate in Arkansas since at least 2000.

71. Two weeks before Election Day in 2020, Senator Elliot appeared to be neck and neck with white incumbent Representative French Hill in the contest to represent the Second Congressional District. Polls estimated that the contest might be a dead heat, with both candidates projected to garner 47% of the vote. The day before Election Day, the Cook Political Report changed its rating of the contest from leaning in Representative Hill's favor to a "Toss Up."

72. Polls also reflected that 86% of Black voters supported Senator Elliott over Congressman Hill, by far her most cohesive support from any demographic group. A unified community of Black voters in Pulaski County was Senator Elliott's political base, and their

17

enthusiastic support was the engine that made it possible for Senator Elliott to make the election as competitive as it was.

73.    Senator Elliott ultimately lost the congressional election by a margin of 44.63% to 55.37%.  At the same time, however, she handily carried the growing heart of the Second Congressional District in Pulaski County, where she bested Congressman Hill by nearly 20 percentage points.

## THE EVENTS SURROUNDING THE ENACTMENT OF THE 2021 REDISTRICTING PLAN

### *The Plan Is Introduced Via an Unusual Eleventh-Hour Substitution and Rushed to Enactment, As Legislators Question the Irregular Process*

74.    On September 20, 2021, the congressional redistricting process kicked off in the Arkansas Legislature with hearings on proposed maps before a joint committee of the House State Agencies and Governmental Affairs Committee (the "House Committee") and the Senate State Agencies and Governmental Affairs Committee (the "Senate Committee").

75.    The earliest proposals by both parties reflected common agreement that county splits should be avoided.  For example, three initial maps were introduced by Republican Representatives Nelda Speaks and Jack Ladyman, and by Democratic Representative David Whitaker.  Both Representative Speaks and Representative Whitaker specifically noted that, in an effort to adhere to traditional redistricting principles, their maps split zero counties.

76.    The House Committee and Senate Committee held additional joint hearings on September 23 and September 27, 2021 to consider other proposed maps.  These hearings included opportunity for public comment.  During the September 23 hearing, Senators Bart Hester and Alan Clark each introduced maps that split Pulaski County into two Congressional Districts.  In explaining his decision to split Pulaski County, Senator Clark alluded to its racial demographics—

18

noting that Pulaski was the state's "most populous, diverse" county. Both Hester and Clark are white and members of the legislative majority Republican party.

77. The September 27 joint hearing featured the introduction of nine additional maps. Four of these maps split Pulaski County. Reflecting a continued understanding by members of the legislative majority that county splits are disfavored, Senator Mark Johnson (also white and a Republican) introduced a map that split no counties, stating that "keep[ing] counties together" is "one of the most important things [the Legislature] can do."[5]

78. During a meeting of the House Committee on September 29, Committee Chairman Representative Dwight Tosh explained that committee members would informally rank their top three map choices from among the proposals under consideration, and that the committee would then vote on the highest-ranked proposal for advancement to the full House.

79. When the House Committee ranked the proposals before it, House Bill ("HB") 1971 was ranked highest. HB 1971 was a proposal advanced by Representative Nelda Speaks.

80. HB 1971 split Pulaski County across two, not three, congressional districts, as compared to the enacted Plan. HB 1971 also excised from the Second Congressional District significantly fewer Black voters and voters in general from the cities of Little Rock and North Little Rock than were excised by the enacted 2021 Congressional Redistricting Plan.

81. Because HB 1971 was ranked highest in the committee's informal ranking, Chairman Tosh's plan called for HB 1971 to receive a formal committee vote that would dictate whether HB 1971 would be reported out for consideration by the full House.

---

[5] House and Senate Committees on State Agencies and Governmental Affairs, at 3:35:45–3:35:56 PM (Sept. 27, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20210906/-1/21840#handoutFile_ [hereinafter Sept. 27, 2021 Joint State Agencies and Governmental Affairs Committee].

82.    But, despite being ranked highest by the committee, HB 1971 did not receive a formal vote.  Instead, after the ranking process, HB 1971 was amended during the House Committee meeting of September 30.  Chairman Tosh then adjourned the meeting and said the committee would leave HB 1971 "where it's at, at this time, for the public to view it."[6]

83.    During the next House Committee meeting on October 5, 2021, the committee resumed debate on HB 1971.  Before the committee could discuss HB 1971, however, Representative Jeffrey Wardlaw, who is white, abruptly moved to substitute HB 1982, a new bill, for HB 1971.

84.    HB 1982 was filed for the first time at 8:40 p.m. on October 4, 2021, the night before it was substituted for HB 1971 before the House Committee.  Like HB 1971, HB 1982 was sponsored in the House by Representative Nelda Speaks.

85.    In the House Committee meeting of October 5, Representative Wardlaw's successful motion replaced the extensively debated HB 1971 with the brand-new HB 1982.  The brief debate over the new bill—the only time HB 1982 was ever debated in committee—centered on the concerns of multiple committee members that the substitution of HB 1982 violated Chairman Tosh's ranking plan.

86.    Public comment on HB 1982 before it was passed by the House Committee consisted of a few minutes at the end of the October 5 meeting during which one Black Pulaski County resident expressed concern about the proposed map's effect on the county's Black population.  Minutes before the committee voted to pass HB 1982, this public commenter warned

---

[6] House Committee on State Agencies and Governmental Affairs, at 2:13:00–2:13:04 PM (Sept. 30, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20210929/-1/21862.

that the split of Pulaski County and the City of Little Rock was "a direct target on our city, and particularly on African Americans."[7]

87.     HB 1982 passed out of the House Committee on October 5, 2021 by a vote of 12 to 5.

88.     Just one day later, on October 6, HB 1982 passed the full House by a vote of 59 to 30 and was transmitted to the Senate. On October 7, 2021, the Senate passed HB 1982.

89.     Senate Bill 743 ("SB 743), was the counterpart bill to HB 1982 introduced in the Senate. Like HB 1982, it was similarly rushed to enactment after also being introduced late in the process of review and debate of redistricting plans.

90.     SB 743 was filed for the first time at 8:45 PM on October 4, 2021, the same evening as HB 1982.

91.     SB 743 was presented for the first time to the Senate Committee on the morning of October 5, 2021, the very next day after it was first filed. Upon being presented with the bill and being urged to pass the bill quickly through to the full Senate by President Pro Tempore Jimmy Hickey (a white member of the Republican majority in the Senate), multiple senators from Senator Hickey's own party complained about the bill being rushed through the committee process. SB 743 was passed by the Senate Committee that same afternoon.

92.     On October 6, just one day after it was first considered by the Senate Committee, SB 743 was passed by the full Senate by a vote of 23 to 10 and was transmitted to the House. On October 7, 2021, the House passed SB 743.

---

[7] House Committee on Stage Agencies and Governmental Affairs, at 3:59:32–3:59:36 PM (Oct. 5, 2021),                                                                          https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20211005/-1/21867.

93.     On October 7, 2021—just two days after both HB 1982 and SB 743 were first

debated in the General Assembly—the identical bills were both enrolled as the approved 2021

Redistricting Plan and were transmitted to the governor.

**The 2021 Congressional Redistricting Plan**

94.     HB 1982 and SB 743 represented a dramatic departure from the 2011

Congressional Districting Plan in which Pulaski County and Little Rock were entirely within the

Second Congressional District, as they had been for decades under numerous prior redistricting

plans. The previous configuration of the Congressional Districts from 2011 to 2021 is shown here:



22

95.     As enrolled, the 2021 Redistricting Plan that established Arkansas's current Congressional Districts trisected Pulaski County into three separate Congressional Districts.  The basic configuration of those districts is shown here:



96.     HB 1982 and SB 743 were pushed through the full House and Senate over the course of less than three days.

97.     During this process, multiple state legislators, including members of the majority party who ultimately voted in favor of the bill, expressed concern about the rushed and irregular process by which the 2021 Congressional Redistricting Plan became law.

98.     Members of the House Committee emphasized that they had objections to the last-minute substitution of HB 1982.

99.    Representative John Payton, a white member of the majority party, objected that the difference in the maps created by HB 1982 and HB 1971 "totally changes how [he] would rank the bills," and complained that at the time the Committee ranked bills, the members did not know "we were not ranking bills, but ranking sponsors" of those bills.[8]

100.    Representative Rick Beck, also a white member of the majority party, noted, "I can't vote for [HB 1982] because the process in which we got here, I think was less than transparent."[9]

101.    Similarly, members of the Senate Committee were upset that they received SB 743—the identical companion to HB 1982 that would ultimately be reported out of the Committee—only late the night before the Committee's October 5 deliberations.

102.    Senator Mathew Pitsch, a white member of the majority party, made clear that he was angry about the short notice given to review the new bill, saying he could not repeat in a Senate proceeding the language his constituents had used upon hearing about the new bill.

103.    Senator Trent Garner, also a white member of the majority party, voiced his frustration at the lack of information available regarding the map on which the Committee was being asked to vote.

### *Legislative Proponents of the 2021 Redistricting Plan Knew They Were Targeting Black Voters, and Were Repeatedly Reminded That the Consequence of This Cracking Would Be Diminished Political Opportunity for Black Voters*

104.    The Legislature knew that the areas carved out of the Second Congressional District were disproportionately Black when it voted to approve the 2021 Redistricting Plan.

105.    That is true, among other reasons, because the Legislature was provided demographic data from the Bureau of Legislative Research that documented these disparities during its

---

[8] *Id.* at 4:05:06–4:06:17 PM.
[9] *Id.* at 4:07:27–4:07:42 PM.

consideration of the 2021 Redistricting Plan.  Indeed, statistics showing the racial demographics of the parts of Pulaski County excised from the Second Congressional District were presented to members of the Senate State Agencies and Governmental Affairs Committee.

106.    While the 2021 Redistricting Plan was being rushed to enactment, its proponents were warned repeatedly in the short time available for comment leading up to their vote that the plan targeted Black voters for movement and otherwise would harm Black voters' electoral opportunities.

107.    Specifically, the committee was confronted with data illustrating the racial disparities described above by Senator Clarke Tucker, a white legislator who represents parts of Pulaski County and who opposed the 2021 Redistricting Plan.  Senator Tucker presented statistics to the committee showing that the areas proposed to be moved into the First and Fourth Congressional districts were predominantly non-white and that Black voters constituted the single largest demographic group in each area.  Senator Tucker warned other members of the committee that "[t]he impact is . . . we're moving two different parts of Pulaski County that are predominantly nonwhite into two different Congressional districts."[10] And he further warned that "by cutting off these two specific communities, and putting them in separate congressional districts, we're hurting them more than the rest of the county."[11]

108.    Senator Jane English, a white legislator and member of the majority party who was the Plan's sponsor in the Senate, responded to Senator Tucker: "I don't disagree with a lot you said."[12]

---

[10] Oct. 5, 2021 Senate Committee on State Agencies and Governmental Affairs (PM Session), *supra* note 1, at 3:15:38–3:15:48 PM.
[11] *Id.* at 3:17:50–3:17:59 PM.
[12] *Id.* at 3:17:45–3:18:10 PM.

109.    Likewise, multiple members of both houses of the General Assembly implored the Legislature to consider the harmful impact that the 2021 Redistricting Plan would have on representation for neighborhoods populated by Black and other racial minority residents of the Little Rock area in Pulaski.

110.    Representative Monte Hodges, a Black member of the House, confronted proponents of HB 1982 with the discriminatory nature of the proposed redistricting map during debate on the House floor, after HB 1982 was passed out of committee, but prior to the vote on HB 1982 in the full House:

> We all know what's going on here. It's no secret. Southeast Pulaski County is being split into three different congressional districts. Before we came down here to draw these maps, we all knew who lived in the southeast corner of Pulaski County. Who all knows who lives in south Little Rock, Rose City, Wrightsville and College Station. It's people who look like me. . . .
>
> In fact, according to the census data, the precincts that this map moves to the First and Fourth districts are 65% and 70% nonwhite respectively. . .
>
> That part of Pulaski County has its own judicial subdistrict because of the racial makeup of those precincts. This is so they have fair and diverse representation on the bench. This map will do the exact opposite. It will dilute and diminish their representation.[13]

111.    In the Senate State Agencies and Governmental Affairs Committee, Senator Tucker stated:

> [T]he part of Pulaski County that's been cut out resembles Judicial Subdistrict 6.1, which is a circuit that was created to promote diversity on the circuit court bench in Pulaski County, which obviously means it's a predominantly African American part of the county. . . . [T]he legislature is

---

[13] Arkansas House of Representatives, 93rd General Assembly, at 1:55:10–1:56:42 PM (Oct. 6, 2021),                                                                    https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20211006/-1/21885?gefdesc=&startposition=20211006104932#handoutFile_ [hereinafter Oct. 6, 2021 Arkansas House of Representatives].

inviting trouble if we're chopping a predominantly African American part of Pulaski County into three congressional districts.[14]

112.    Senator Tucker explained that splitting minority communities across multiple congressional districts impairs their ability to be adequately represented, and that removing largely minority communities to the First and Fourth Congressional Districts was "hurting them more than the rest of the county."[15]

113.    Senator Linda Chesterfield, a Black state legislator who represents part of Pulaski County, similarly spoke out against the passage of SB 743 during the Senate Floor Session held on October 6, 2021. Senator Chesterfield observed that the 2021 Redistricting Plan was retaliation for how close Black voters, with the support of other voters in the Second District, had come to electing a Black Congresswoman:

> I know surely, the fact that in the last congressional race in the Second Congressional District, a Black woman launched a credible race against the incumbent. How dare she? How dare the folks in my senate district who support her overwhelmingly? How dare they be proud to see someone who looks like them, has a history like theirs, vie for one of the highest positions in this country? How dare they want their state to join the other former Confederate states in having Black representation? That desire, and that hope is being squashed here today by the map that you are presenting for our consideration. The state senate district I represent is being punished.[16]

---

[14] Senate Committee on State Agencies and Governmental Affairs (AM Session), at 11:15:22–11:16:23 AM (Oct. 5, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20211005/-1/21879?gefdesc=&startposition=20211005103714#agenda_ [hereinafter Oct. 5, 2021 Senate Committee on State Agencies and Governmental Affairs (AM Session)].

[15] Oct. 5, 2021 Senate Committee on State Agencies and Governmental Affairs (PM Session), *supra* note 1, at 3:17:45–3:17:59 PM.

[16] Arkansas Senate, 93rd General Assembly (AM Session), at 10:51:00–10:51:53 AM (Oct. 6, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20211006/-1/21884?gefdesc=&startposition=20211006085712#agenda_.

114.    As Representative Hodges emphasized, the cracking of Black communities "means that neighbors, churchgoers, classmates, and coworkers living in the same communities are going to have completely different representation." [17]

115.    Representative Jamie Scott, who is Black, similarly objected that cracking Black communities in Little Rock not only dilutes their political influence, but also harms those communities by putting them "in the tough position of having to talk to three different congresspersons for any major project, need, or natural disaster."[18]

116.    The Legislature moved forward with the 2021 Redistricting Plan even as Senator Tucker pointed out that he had "seen other maps proposed by both Democrats and Republicans where all 75 counties are whole" and where the deviations of the four Congressional districts from the ideal population "are still smaller than they are with this map."[19]

117.    On October 6, 2021, Governor Hutchinson, speaking to reporters before the Legislature's adoption of the 2021 Redistricting Plan, urged the General Assembly, if it chose to split Pulaski County, "to keep in mind that you do not want to dilute minority representation or influence in congressional races".[20]

118.    After the 2021 Redistricting Plan passed out of the Legislature on October 7, Governor Hutchinson refused to sign the Plan, despite its having been introduced and supported by his own political party.  He instead allowed it to take effect without his signature.  In so doing, Governor

---

[17] Arkansas Senate, 93rd General Assembly, at 1:54:07–1:56:09 PM (Oct. 6, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20211006/-1/21885?gefdesc=&startposition=20211006104932#handoutFile.

[18] *Id.* at 11:07:41–11:08:35.

[19] Oct. 5, 2021 Senate Committee on State Agencies and Governmental Affairs (AM Session), *supra* note 14, at 10:50:59–10:51:15 AM.

[20] Governor Asa Hutchinson, *Governor Hutchinson's Weekly Media Briefing (10.06.21)*, YouTube (Oct. 6, 2021), at 21:10–21:33, available at https://www.youtube.com/watch?v=T5E0Pn99DDo.

Hutchinson emphasized that he was "concerned about the impact of the redistricting plan on minority populations," and specifically noted that "the removal of minority areas in Pulaski County into two different districts raises concerns."[21]

119.    The Governor explained he was neither signing nor vetoing the Plan because he wanted to "enable those who wish to challenge the redistricting plan in court to do so." He added: "Whether you diminish minority voting strength and you have particular harm to that population in the Second District to me that is the fundamental question . . . the courts will have to evaluate."[22]

### *Proponents Give False, Pretextual Reasons for Refusing to Discuss the Known Racially Discriminatory Targeting and Other Harms of the Plan When Called to Their Attention*

120.    White proponents of the 2021 Redistricting Plan largely refused to engage with the clear warnings that what would become the enacted Plan targeted Black voters for movement and would harm the electoral prospects of Black voters, particularly Black voters known to reside in southeast Pulaski County, anchoring the Second Congressional District.

121.    White legislators who supported the Plan largely refused to address valid concerns about the harmful effect that the redistricting would have on the voting rights of Black voters, even when confronted with that obvious reality.

122.    Instead, they accused those who raised concerns about racial discrimination of "performative theatrics," and called those valid concerns "laughable."[23] They also deflected those

---

[21] *Governor Hutchinson Allows Vaccine Mandate, Redistricting Bills to Become Law Without His Signature*, Off. Website of the State of Ark. (Oct. 13, 2021), https://directory.arkansas.gov/agency/governors-office/news/governor-hutchinson-allows-vaccine-mandate-redistricting-bills-to-become-law-without-his-signature/#:~:text=%E2%80%9CI%20am%20concerned%20about%20the%20impact%20of%20the,Pulaski%20County%20into%20two%20different%20districts%20raises%20concerns.

[22] Noah Tucker, *Governor Approves State of Arkansas's Redistricting Map*, KY3 (Dec. 8, 2021), https://www.ky3.com/2021/12/08/governor-approves-state-arkansas-redistricting-map/.

[23] Oct. 6, 2021 Arkansas House of Representatives, *supra* note 13, at 1:52:03–1:52:41 PM.

concerns, claiming that merely discussing the plan's racial impacts constituted impermissible consideration of racial demographics.

123.    That pretextual reason for refusing to justify the forewarned, racially discriminatory harm under the proposed plan was false. In fact, avoiding dilution of minority voting strength is not only permissible, but also may be necessary to comply with federal law.

### Public outcry after the Plan's passage underscores its race-based harms

124.    There was a swift public outcry in response to the passage of the 2021 Redistricting Plan, and its targeting of Black voters in Pulaski County. The immediacy of this response further underscores that the racial harms of the 2021 Redistricting Plan were readily known and immediately obvious, including to the proponents who were motivated by those impacts.

125.    For example, Little Rock Mayor Frank Scott, who is Black, expressed that he was "deeply concerned about the gerrymandering along racial lines happening in our community, which was designed to dilute the voices of the residents of Little Rock."[24]

126.    Little Rock NAACP Chapter President Dianne Curry said, "This is an embarrassment to the state of Arkansas to know in the 21st century we're dealing with blatant discrimination."[25]

## THE SECOND CONGRESSIONAL DISTRICT IN THE 2021 REDISTRICTING PLAN IS A RACIAL GERRYMANDER

127.    A redistricting plan is an unconstitutional racial gerrymander under the Fourteenth Amendment if "(1) race is the dominant and controlling or predominant consideration in deciding

---

[24] Neal Earley, *Central Arkansas Mayors Hartwick, Scott Unhappy with Redistricting Split*, Ark. Democrat Gazette (Oct. 9, 2021), https://www.arkansasonline.com/news/2021/oct/09/central-arkansas-mayors-hartwick-scott-unhappy/.

[25] Andrew DeMillo, *Arkansas Governor OKs House Map Splitting Little Rock Area*, Associated Press (Oct. 13, 2021), https://apnews.com/article/congress-asa-hutchinson-arkansas-little-rock-elections-ef96ca92ca6a5bd99f2e6beba715a6cb.

to place a significant number of voters within or without a particular district, and (2) the use of race is not narrowly tailored to serve a compelling state interest." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015) (internal citations and quotations omitted). One such compelling interest in this context is compliance with the Voting Rights Act of 1965. *See Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam); *Cooper v. Harris*, 581 U.S. 285, 292 (2017).

128.    As set forth in more detail *infra*, the creation of the Second Congressional District in the 2021 Redistricting Plan has the indicia of racial gerrymandering identified by the U.S. Supreme Court. It disregards traditional redistricting principles, needlessly cutting through political subdivision boundaries and cracking longstanding communities of interest, in order to carve predominantly or otherwise heavily Black precincts out of the Second Congressional District.

129.    No permissible motive explains these decisions, and no compelling interest, such as compliance with Section 2 of the Voting Rights Act, permits them. To the contrary, the sorting of voters in and out of the Second Congressional District in the 2021 Redistricting Plan contravened traditional redistricting principles and the legislators' own stated goal of not splitting counties. Black voters in Pulaski County in the Second Congressional District were specifically targeted for removal without any compelling state interest.

### The 2021 Redistricting Plan Divides Political Subdivisions and Fragments Black Communities of Interest in Pulaski County Without Justification

130.    It is common knowledge that the Black population of Pulaski County is concentrated in the County's southeast. This is a legacy of years of segregationist policies in Arkansas that have resulted in continuing, ongoing housing segregation.

131.    The 2021 Redistricting Plan's defining feature is how it took surgical aim at the southeast part of Pulaski County that had been in the Second Congressional District, cracking the Black population center of that county into not two but three different congressional districts.

132.    The 2021 Redistricting Plan splits Pulaski County among three of Arkansas's four congressional districts—Arkansas's First, Second, and Fourth Congressional Districts, as illustrated below.



133.    This improper practice of fragmenting and dispersing minority populations across districts is known as "cracking."

134.    Although the General Assembly needed to move only roughly 16,510 people out of the Second Congressional District to balance district populations in the 2021 redistricting process, it moved 41,392—mainly from heavily Black southeast Pulaski County—out of the Second Congressional District in the enacted Plan.

32

135.    The VAP moved out of the Second Congressional District is disproportionately Black. Overall, more than half of the voters who were moved out of the Second Congressional District were Black, and more than two thirds were nonwhite.

136.    Specifically, the VAP removed from the Second Congressional District to the First Congressional District is 57% Black. The VAP removed from the Second to the Fourth is 50% Black. But the VAP that stayed in the Second Congressional District is only 21% Black.

137.    Taking into account other voters of color makes the disparities even more stark. Of the voters moved into the First Congressional District, 62% were non-white. Of those moved to the Fourth Congressional District, 70% were non-white. As discussed above, *supra* ¶¶ 104–19, the Legislature knew the demographic makeup of these areas when it considered, and ultimately voted to enact, the 2021 Redistricting Plan.

138.    By contrast, as the Legislature was aware that virtually *no* Black voters were moved into the Second Congressional District—less than one half of one percent of the total voters added. Nearly all of the voters added to the Second Congressional District—approximately 93%—were white.

139.    The Legislature chose to add this overwhelmingly white population to the Second Congressional District even though, as noted above, the Second Congressional District was overpopulated based on the results of the 2020 Census.

140.    At a precinct level, the 2021 Redistricting Plan moved fourteen precincts in Pulaski County out of the Second Congressional District, newly placing some of those fourteen precincts into the First Congressional District and the rest into the Fourth. Twelve out of the fourteen precincts that were moved out of the Second Congressional District were majority Black or otherwise served significant Black populations.

141.    In addition, ten of the fourteen precincts fall at least partially within what is commonly referred to as a "Hunt District."  This is a judicial subdistrict that was established by consent decree in the early 1990s to comply with Section 2 of the Voting Rights Act.  The purpose of a Hunt District is to provide electoral opportunity to Black voters to remedy the vote dilution arising out of the interaction between a challenged judicial electoral structure and segregated housing, racial bloc voting opportunity, and other conditions in these areas of Arkansas.

142.    The **figure below** demonstrates the laser-precision with which the Legislature carved through Black communities in Pulaski County in the sorting of voters among districts in the 2021 Redistricting Plan.

143.    While all of Pulaski County was formerly in the Second Congressional District, dividing lines now trisect areas with concentrated Black populations, distributing Black voters across the First, Second, and Fourth Districts.  The below illustration shows the concentration of Black voters (those in red) in Pulaski County, including in the precincts excised from the Second Congressional District by the 2021 Redistricting Plan.

34



144.   Specifically, the Black voters who were moved to the First Congressional District now vote in a district with a VAP that is 75.8% white and only 16.9% Black. That is because the sprawling First Congressional District joins Black communities in the Mississippi River Delta region south and east of Pulaski County with counties in the Ozarks that are more than 90% white and have negligibly small Black populations.

145.   In the Fourth Congressional District, Black voters are likewise a small minority. The white VAP of the redrawn Fourth Congressional District is 69.6%, and the Black VAP of the Fourth Congressional District is 19.8%. This district combines sizable Black communities in southern Pulaski County and nearby Jefferson County, southeast of Little Rock, with far flung counties in the western part of the state with majority or supermajority populations of white voters.

35

146.    As a result, Black voters comprise at least 16.9% of the VAP in three different districts, but do not exceed 20.4% of the VAP in any of them.

### *Traditional Redistricting Principles Call for Maintenance of Political Subdivisions and Communities of Interest*

147.    The general principles that should govern congressional redistricting in Arkansas and elsewhere are well established, and often referred to as traditional redistricting principles.

148.    Traditional redistricting principles include, among others: creating districts that are contiguous and geographically compact, preserving whole political subdivisions, respecting communities of interest, avoiding dilution of minority voting rights, and complying with other constitutional mandates, including equal protection and the one person, one vote principle.

149.    As set forth above, redrawn districts must first comply with the constitutional mandate of equal population, also known as "one person, one vote." As explained by the Arkansas Board of Apportionment, this requires that congressional districts "must as nearly as practicable result in each congressional district having an equal population."[26]

150.    In sorting voters between and among districts to apportion voters to satisfy population equality principles, the Arkansas Board of Apportionment has identified "Maintaining Cores of Existing Districts Where Practicable" as a "common redistricting principle" in Arkansas. According to the Board, this serves the important goal of "help[ing] preserve continuity of representation."[27]

151.    With respect to preserving whole political subdivisions, the Board of Apportionment has explained that it is generally "preferable to minimize splitting political

---

[26]    *Redistricting    Standards    and    Requirements*, Ark.    Bd.    of    Apportionment, https://arkansasredistricting.org/about-the-process/redistricting-criteria-2/ (last visited May 21, 2023).
[27] *Id.*

subdivisions such as counties, cities, and voting precincts.  When possible, it is better to keep whole counties, cities or towns, wards, and so forth intact."[28]

152.    Similarly, the Board of Apportionment has recognized that "Maintaining Communities of Interest Where Possible" is a traditional redistricting principle.  "Preservation of communities of interest describes the goal of maintaining a substantial group of people in a specific geographic area where those individuals share common identifiable interests."[29]

153.    Non-dilution of minority voting rights—and, in particular, compliance with Section 2 of the Voting Rights Act of 1965—are traditional redistricting principles that require decisionmakers to consider racial demographics, any voting patterns correlated with race, and other circumstances bearing on minority electoral opportunity, to ensure that maps do not deny or abridge minority voters' ability to elect their preferred candidates.  As articulated by the Arkansas Board of Apportionment, this principle requires decisionmakers to consider demographic data and pay attention to where there are "concentrations of minorities."[30]

154.    Thus, it is permissible and indeed sometimes necessary for legislators to be aware of racial demographics when redistricting.  "[R]edistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors."  *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (emphasis in original).  Accordingly, "[a] State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests."  *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

---

[28] *Id.*
[29] *Id.*
[30] *Id.*

155.    What a state may not do, however, is "separat[e] its citizens into different voting districts on the basis of race" without sufficient justification, such as complying with the Voting Rights Act. *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017)).

### *Arkansas Legislators' Stated Goal in the 2021 Redistricting Was Not to Split Political Subdivisions Like Counties*

156.    When it came to maintaining whole political subdivisions in congressional line-drawing after the 2020 Census, lawmakers from both houses of the General Assembly and both political parties emphasized their consensus at the outset of the redistricting process not to split counties.

157.    A joint House and Senate session of the State Agencies and Governmental Affairs Committees ("State Agencies Committees") was held to discuss proposed congressional redistricting maps on September 27, 2021. At the September 27 joint session, white member of the majority party Representative Stephen Meeks, in presenting a proposed redistricting map, HB 1966, noted to the committees that in "the debate [about redistricting] earlier last week . . . the first concern that we all had was whole counties."[31]

158.    In the same joint committee session, white member of the majority party Senator Mark Johnson presented his own redistricting map, SB 729, to the committees. During his presentation, Senator Johnson emphasized that keeping counties intact is "one of the most important things we can do because our citizens get confused" when counties are split.[32] Senator Johnson also stated, "I think

---

[31] Sept. 27, 2021 Joint State Agencies and Governmental Affairs Committee, *supra* note 4, at 3:30:11–3:31:02 PM.
[32] *Id.* at 3:35:00–3:36:00 PM.

it was a mistake in 2010 to split counties in the first place. Arkansas does not have to do that to come up with good congressional districts."[33]

159.    In a House Committee session held on September 29, 2021, white member of the minority party Representative David Whitaker, in presenting a potential redistricting map, HB 1968, noted to the committee, "While it seemed folks were certainly generous enough as far as wanting to discuss the theory of splitting counties, the minute that you presented a map that had split counties in it, you had rather stiff opposition and strong opinions."[34]

160.    Consistent with the General Assembly's stated goal of keeping counties intact, both Black and white legislators, and legislators from both parties in both chambers of the General Assembly, proposed maps that would have kept all counties intact.

161.    In fact, as noted above, Representative Nelda Speaks—the sponsor of the house bill that ultimately passed into law—originally proposed another map that split no counties. Indeed, when Representative Speaks presented HB 1959 on September 20, 2021, she argued that the map "meets all the principles we were asked to follow," including that it "does not split a single county."[35]

*In Creating the Second Congressional District, the 2021 Redistricting Plan Subordinates Traditional Redistricting Principles and the Legislators' Own Stated Intent Not to Split Political Subdivisions Like Counties*

---

[33] *Id.* at 3:45:18–3:45:45 PM.
[34] House Committee on State Agencies and Governmental Affairs, at 1:16:38–1:18:00 PM (Sept. 29, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20210906/-1/21848#agenda .
[35] House and Senate Committees on State Agencies and Governmental Affairs, at 1:07:30–1:08:39 PM (Sept. 20, 2021), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20210920/-1/21833?gefdesc=&startposition=20210920125910.

162.    In cracking Black communities in Pulaski County into three separate congressional districts, Arkansas's Legislature actively disregarded traditional redistricting principles and contradicted its own stated guiding principles.

163.    In particular, the 2021 Redistricting Plan fractures political subdivisions at multiple levels, not only the county itself but also smaller political subdivisions—including multiple municipalities, school districts, and circuit court districts within the county.

164.    To begin, the three-way cracking of Pulaski County is contrary to the Legislature's stated preference for keeping counties intact.

165.    For the first time in recent history, the Legislature split one county into not two but *three* different congressional districts.

166.    Moreover, even if it had been necessary for the Legislature to create a small number of county splits in order to equalize population or in pursuit of other legitimate redistricting goals, that could not justify the decision the Legislature made here: to place the district boundaries that subdivide counties—which proponents of the act themselves recognized as harmful—so that they ran through the heart of the Black community in south and southeastern Pulaski County.  No legitimate redistricting principle required the Legislature to single out Black voters for this recognized harm.  On the contrary, longstanding redistricting principles such as respecting communities of interest counseled against doing so.

167.    Moreover, the Black voters of southeastern Pulaski County were the only community in the entire state that was targeted for the extraordinary harm of being split not once but twice, into not two but *three* different congressional districts.  This was the only deviation in the entire state from the ordinary practice, continued elsewhere, of splitting counties into at most two different districts.

40

168.    In choosing to crack Black communities in southeastern Pulaski County, the Legislature rejected alternative approaches that would have maintained whole counties, or at least would have treated white and Black communities equally when splitting counties and respected communities of interest within them.

169.    This means that Black voters in this area of Pulaski County seeking federal funding for highway construction, historically Black colleges and universities, healthcare, veterans benefits, and other needs, will need to speak to three different members of Congress.

170.    Moreover, even within Pulaski County, the 2021 Redistricting Plan divides other local political subdivisions.

171.    The 2021 Redistricting Plan splits three different municipalities within Pulaski County, including the two largest cities in the county: Little Rock and North Little Rock. Little Rock is now split between the Second and Fourth Congressional Districts, while North Little Rock is split between the First and Second Congressional Districts. The boundary line between the First and Second Congressional Districts also splits the city of Jacksonville, moving a small fragment of the city (encompassing approximately 145 people) into the First Congressional District.

172.    The figure below shows the splits of municipalities within Pulaski County created by the 2021 Redistricting Plan.



173.    The portions of Little Rock and North Little Rock moved out of the Second Congressional District by the 2021 Redistricting Plan had majority-Black populations. And Black persons made up a substantially larger percentage of the population in the areas of these cities that were removed from the Second Congressional District than in the areas that remained. Black persons made up 61.26% of the population in Little Rock that was moved out of the Second Congressional District, compared to comprising only 40.23% of the population that remained in the Second Congressional District. Black persons made up 73.59% of the population in North Little Rock that was moved out of the Second Congressional District, compared to comprising only 42.19% of the population that remained in the Second Congressional District.

174.    The 2021 Redistricting Plan also repeatedly splits school districts within Pulaski County.

175.    Specifically, the redrawn lines cut through all four of the major school districts in Pulaski County: the Little Rock School District, the North Little Rock School District, the Jacksonville School District, and the Pulaski County Special School District.

176.    For example, while the parts of Pulaski County that fall within the Pulaski County Special School District were previously all in the Second Congressional District, those areas are now represented by three separate members of Congress. This means that parents seeking federal funding for the school district will need to advocate to three different members of Congress.

177.    The 2021 Redistricting Plan also splits the Little Rock School District and the North Little Rock School District, and the Jacksonville School District. It places portions of the North Little Rock School District and the Jacksonville School District into the First Congressional District, while the bulk of each school district remains in the Second Congressional District. Similarly, it places portions of the Little Rock School District into the Fourth Congressional District, while the bulk of the school district remains in the Second Congressional District.

178.    The figure below shows the splits of school districts within Pulaski County created by the 2021 Redistricting Plan.



179.    The splits of the Little Rock School District and North Little Rock School District had a clear racially discriminatory impact very similar to the municipal splits described above. *See*

*supra* ¶¶ 170 –73.  In addition, the splits of the Jacksonville School District and Pulaski County Special School Districts likewise carved higher concentrations of Black persons in those districts out of the Second Congressional District.  In the Jacksonville School District, the portion placed into the First Congressional District was majority-Black (51.2% Black) while the portion that remained in the Second Congressional District was majority-white (51.9% white).

180.    In addition, the 2021 Redistricting Plan splits Circuit Court subdistrict 6.1 within Pulaski County.  This is particularly significant because—as this Complaint explains elsewhere, *see supra* ¶¶ 9, 141—this judicial subdistrict, colloquially known as a "Hunt District," exists to remedy voting discrimination by providing electoral opportunity to Black voters; it therefore encompasses areas where Black voters have historically formed a majority voting bloc.

181.    As shown below, the 2021 Redistricting Plan's three-way split of Pulaski County goes right through the middle of Circuit Court subdistrict 6.1.



182.    Each of the three sections of subdistrict 6.1 split by these lines are majority-Black.

183.    In addition, the smaller portions of subdistrict 6.2 that were carved out of the Second Congressional District where that subdistrict was split have a significantly higher concentration of Black persons than the bulk of that subdistrict that was kept in the Second Congressional District. For example, the portion of subdistrict 6.2 that was moved to the Fourth Congressional District has a population that is nearly half Black persons (47.89%) and less than a third white persons (31.54%). By contrast, the portion of subdistrict 6.2 that remained in the Second Congressional District has a population that is less than a third Black persons (30.00%) and more than half white persons (56.71%).

184.    The 2021 Redistricting Plan also splits predominantly Black communities of interest within Pulaski County.

185.    For example, the newly drawn district lines bisect church congregations across the greater Little Rock metropolitan area, mainly in predominantly Black areas.

186.    The 2021 Redistricting Plan also splits urban, historically Black neighborhoods in southeastern Pulaski County such as Rose City that share important interests and had long voted together in Congressional elections.

187.    In other words, the 2021 Redistricting Plan drove a wedge into longstanding Black communities of interest in Pulaski County, such that "neighbors, churchgoers, classmates and coworkers living in the same communities will have completely different representation."[36]

### *Desire for Partisan Advantage Cannot Explain the 2021 Redistricting Plan*

188.    A desire for partisan advantage cannot explain the stark differential treatment of Black and white communities in the 2021 Redistricting Plan.

---

[36] Arkansas Senate, 93rd General Assembly, *supra* note 17, at 1:54:07–1:56:09 PM (Oct. 6, 2021).

45

189.    White Democratic voters were included in the redrawn Second Congressional District at a notably higher rate than Black Democratic voters within the same counties at issue. White unaffiliated voters were included in the Second Congressional District at a notably higher rate than Black unaffiliated voters within the same counties.

190.    There is thus an inference that race, not party, drove the selection of voters that were moved out of the Second Congressional District and into the First and Fourth Congressional Districts, or kept in the Second Congressional District.

191.    Further, even if legislators had been motivated in part by partisan considerations, the Supreme Court's precedent is clear that a legislature cannot segregate voters based primarily on race, even if it does so in part because of partisan considerations. *See Cooper*, 581 U.S. at 308 & n.7.

## THE 2021 REDISTRICTING PLAN HAS THE HALLMARKS OF INTENTIONAL RACIAL DISCRIMINATION

### *The Arlington Heights Decision Sets Out Factors Evidencing Racially Discriminatory Intent Or Purpose*

192.    A redistricting plan violates the Fourteenth and Fifteenth Amendments if the legislature acted with a "racially discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977); *see also Rogers v. Lodge*, 458 U.S. 613, 617 (1982). *Arlington Heights* sets out five non-exhaustive factors that may demonstrate direct or circumstantial evidence of racially discriminatory intent or purpose:  (a) the discriminatory "impact of the official action," and "whether it 'bears more heavily on one race than another,'" (b) the "historical background," (c) the "specific sequence of events leading up to the challenged decision," (d) departures from procedure and substance, and (e) the "legislative or administrative history," including any "contemporary statements" of lawmakers. *Arlington Heights*, 429 U.S. at 266–68 (citations omitted).

46

***Additional Facts Bearing on the Arlington Heights Test for Discriminatory Intent Or Purpose***

193.   All five factors set forth in *Arlington Heights* demonstrate that the 2021 Redistricting Plan was adopted with an intent to discriminate against Black voters and dilute their emerging voting power in Pulaski County in the Second Congressional District and that race was a motivating factor in adopting the Plan.

### *The Plan Bears More Heavily on One Race*

194.   As set forth above, the cracking of Black voters in Pulaski County unquestionably discriminates against Black voters and "bears more heavily on one race than another."

195.   In the presence of racial bloc voting, cracking can weaken the power of Black voters by preventing them from realizing the effect of their bloc voting for their preferred candidates (typically Black candidates) if they are outnumbered by wide margins of white voters who usually bloc vote for different preferred candidates (typically white candidates) than Black voters.

196.   In addition to surgically removing Black voters in Pulaski County from the Second Congressional District, the cracking of Black communities in Pulaski County had the practical effect of moving a significant number of Black voters out of the Second Congressional District and submerging them in two other districts comprised of a majority or supermajority of white voters who have differing interest in political representation, histories, and economies, among other indicators of communities of interest.

197.   Diluting Black voting power through their dispersal out of the Second Congressional District and submersion among majorities or supermajorities of white voters elsewhere reduces the ability of Black voters to impact elections in any congressional district, including the Second Congressional District where Black voters had recently exhibited growing electoral influence.  This dilution also reduces the incentive of candidates to represent the interests

of Black communities in any of the three districts into which the former Second Congressional District Black voters have been dispersed.

### *The Specific Sequence of Events Leading Up to the Challenged Decision Supports a Finding of Discriminatory Intent*

198.    As set forth above, the 2021 Redistricting Plan was passed in the face of growing Black voting power in the Second Congressional District, exemplified by the 2020 election, in which the Second Congressional District nearly elected Arkansas's first Black representative to the U.S. House of Representatives.  It is no coincidence that the very next year, the Legislature dispersed the Black voting base in the Second Congressional District among three congressional districts.

### *The Legislature Departed from Normal Procedure and Substance*

199.    As set forth above, the Arkansas General Assembly departed from its normal substance and procedure in enacting the 2021 Redistricting Plan.

200.    Legislators from both parties repeatedly emphasized the importance of not splitting counties between different congressional districts and introduced multiple bills that did not do so. The 2021 Redistricting Plan not only split Pulaski County, but it also trisected it.

201.    The lines trisecting Pulaski County were irregular and split apart other political subdivisions and communities of interest.

202.    Multiple legislators from both political parties in the House and Senate complained that the 2021 Redistricting Plan was rushed through the Legislature without adequate time for solicitation of public comment, or for legislators to digest or discuss the maps.

203.    After the House State Agencies and Governmental Affairs Committee ranked competing proposals to select the bill to advance to the full House, the highest ranked bill, which split Pulaski County into two congressional districts, was replaced by HB 1982, that split the Black

population in Pulaski County among three congressional districts. Over the objections of multiple members who complained about the introduction of HB 1982 late in the process, the Committee advanced the new map to the full House within hours, giving the Committee members no chance to re-rank their choices.

### The Legislative History and Contemporaneous Statements of Legislators Support a Finding of Discriminatory Intent

204. As set forth above, the legislative history and statements of members of the Arkansas General Assembly reveal the racially discriminatory intent behind the 2021 Redistricting Plan. The proponents of the legislation largely refused to discuss, let alone address its discriminatory impact. They never even attempted to explain why, of all the possible plans, they chose one that moved Black voters out of the Second District into the First District and simultaneously moved a county whose VAP was 93% white out of the First District (which had lost population) into the Second District. Instead, they falsely asserted that it was inappropriate to discuss race at all during debate regarding the Plan. Even Governor Hutchinson refused to sign the bill enacting the 2021 Redistricting Plan into law, warning of the harm due to the cracking of Black voters under the map; yet nonetheless the bill became law.

### Arkansas Has a History of Racial Discrimination

205. In addition, the 2021 Redistricting Plan was enacted in the context of a long record of official discrimination in voting harming Black voters in Arkansas that carries into the present. Indeed, the 2021 Redistricting Plan is the latest iteration of Arkansas's long history of official racial discrimination in voting, discriminatory voting rules, and exclusion of Black people from accessing political power.

206.    As set forth above, no Black person has ever been elected to Congress or to nearly any statewide office in Arkansas.  Most recently, the 2021 Redistricting Plan resulted in yet another all-white congressional delegation elected in 2022.

207.    These exclusionary outcomes are not accidents—they are a legacy of more than a century of consistent, deliberate exclusion of Black voters from the electoral process through violent intimidation, white-only primaries, poll taxes, and racially charged campaign rhetoric.

208.    It is an "inescapable fact" that Arkansas holds a "legacy of a history of discrimination, much of it governmental, beginning with the constitutionally sanctioned institution of human slavery." *Jeffers v. Clinton*, 730 F. Supp. 196, 210 (E.D. Ark. 1989).

209.    This "history of racial discrimination" is particularly acute with respect to "the electoral process." *See Smith v. Clinton*, 687 F. Supp. 1310, 1317 (E.D. Ark. 1988).  As the Eighth Circuit has explained, "[t]he state has a history of official discrimination in its electoral process. Arkansas has used racially discriminatory voting practices such as statutory restrictions on the rights of blacks to vote, discriminatory literacy tests, poll taxes, a 'whites only' Democratic primary, segregated polling places, and at large elections." *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423, 1424 (8th Cir. 1989) (citing *Perkins v. City of W. Helena*, 675 F.2d 201, 211 (8th Cir. 1982)).

210.    In the aftermath of the Civil War, the Fourteenth and Fifteenth Amendments to the U.S. Constitution and laws passed during the Reconstruction Period (like the Civil Rights Act of 1866) were an initial, imperfect attempt to secure the rights of formerly enslaved people to equal citizenship.

211.    Enfranchising formerly enslaved people in Arkansas triggered intense backlash. Arkansas enacted a series of laws, including a poll tax, to disenfranchise Black voters.  As the

Eighth Circuit recognized, "By 1906, blacks had been nearly totally disenfranchised in Arkansas." *Perkins*, 675 F.2d at 211.

212.   Even after passage of the federal Voting Rights Act of 1965, Arkansas's pattern of voting discrimination persisted.  In 1989, the United States District Court for the Eastern District of Arkansas declared that the Arkansas Board of Apportionment's 1981 plan drawing district lines for the General Assembly violated the Voting Rights Act.  The federal district court's ruling, affirmed by the Eighth Circuit, found that the legacy of official racial discrimination by state officials in Arkansas was a factor in limiting Black Arkansans' ability to elect candidates of their choice: "[T]here is a long history of official discrimination.  It has a present effect.  And some instances of it are still occurring." *Jeffers*, 730 F. Supp. at 211.

213.   In 1991, the State of Arkansas admitted that judicial election procedures violated Section 2 of the Voting Rights Act by denying Black voters an equal opportunity to elect candidates of their choice.  *See* Consent Decree, *Hunt v. Arkansas*, No. PB-C-89-406, 1991 WL 12009081 (E.D. Ark. Nov. 7, 1991).

214.   White candidates in Arkansas continue to rely on racially charged rhetoric to deter Black voters from electing the candidates of their choice.  For instance, white Congressman French Hill, campaigning for reelection against Black State Senator Joyce Elliott in 2020, emphasized that if Elliott were elected, "she'd be a member of the Congressional Black Caucus."[37]  In his 2018 reelection campaign, a radio ad supporting Representative Hill featured caricatured Black women stating that his political opponents wanted to go back to "lynching black folks again" and would

---

[37] Frank Lockwood, *Hill, Elliott in Tight Race for U.S. House Seat*, Arkansas Democrat-Gazette (Oct. 18, 2020), https://www.arkansasonline.com/news/2020/oct/18/hill-elliott-in-tight-race-for-us-house-seat/.

revert to "race verdicts" whenever a "white girl screams rape," among other racialized tropes and colloquialisms.

**FIRST CAUSE OF ACTION**

**THE 2021 REDISTRICTING PLAN VIOLATED THE FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTITUTION
U.S. CONST. AMEND. XIV; 42 U.S.C. § 1983
(RACIAL GERRYMANDERING)**

215.    The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.  Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, racial classifications are prohibited unless narrowly tailored to serve a compelling state interest.  U.S. Const. amend. XIV, § 1.

216.    Race was the predominant factor in the creation of Arkansas's Second Congressional District.

217.    Race predominated over traditional redistricting principles such as respecting county, municipal, and precinct boundaries and maintaining communities of interest.  Alternative congressional maps were proposed that balanced the Legislature's population after the 2020 Census and complied with traditional redistricting principles, namely minimizing political boundary splits.  Moreover, race rather than partisan preferences better explains the cracking of voters in Pulaski County in the 2021 Redistricting Plan for the reasons explained above.  *See supra* ¶¶ 188–91.

218.    The use of race as a predominant factor in the creation of the Second Congressional District is not narrowly tailored to serve a compelling state interest.

219.    Thus, the design of the Second Congressional District in the 2021 Redistricting Plan violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

220.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to preliminarily and permanently enjoin enforcement of the 2021 Redistricting Plan will irreparably harm Plaintiffs' constitutional rights.

## SECOND CAUSE OF ACTION

## THE 2021 REDISTRICTING PLAN VIOLATED THE FOURTEENTH AND FIFTEENTH AMENDMENTS TO THE U.S. CONSTITUTION U.S. CONST. AMENDS. XIV AND XV; 42 U.S.C. § 1983 (INTENTIONAL RACIAL DISCRIMINATION)

221.    The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

222.    The facts alleged herein reveal that the 2021 Redistricting Plan was adopted, at least in part, with a purpose to racially discriminate against Black voters in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

223.    The 2021 Redistricting Plan will have a discriminatory impact on Black Arkansans— a fact that was obvious and forewarned when the Legislature enacted the 2021 Redistricting Plan. Elected officials in Arkansas have diminished Black voters' ability to elect or meaningfully impact elections in the Second Congressional District through the purposeful cracking of Black voters, an emerging political force along with other voters, into three different congressional districts.  The Plan was rushed through the legislative process where white legislator proponents of the Plan refused to address the clear racial targeting of Black voters and recognized harms of their proposed sorting of voters.  Governor Hutchinson refused to sign the 2021 Redistricting Plan, expressing concern about its impact on minority voters, yet nonetheless allowed the bill to become law.  The 2021 Redistricting Plan is but the latest effort by Arkansas officials to limit Black voters' access to representation and otherwise the political process.  Today, all four Congressional representatives in Arkansas are white

persons; there has never been a Black person elected to Congress from Arkansas, and Black voters have been denied the opportunity to elect candidates of choice to virtually all other statewide offices.

224.    Therefore, the facts set forth above demonstrate that a discriminatory purpose motivated the enactment of the 2021 Redistricting Plan and the cracking of the Black electorate in Pulaski County.

225.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to preliminarily and permanently enjoin enforcement of the 2021 Redistricting Plan will irreparably harm Plaintiffs by subjecting them to intentionally racially discriminatory districts for the rest of this decade.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

2.    Declare that the Second Congressional District adopted under the 2021 Redistricting Plan constitutes a racial gerrymander in violation of the Fourteenth Amendment to the U.S. Constitution;

3.    Declare that the 2021 Redistricting Plan was passed with discriminatory intent as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution;

4.    Preliminarily and permanently enjoin Defendants from enforcing or giving any effect to the boundaries of the Second Congressional District in the 2021 Redistricting Plan, including enjoining Defendants from calling, holding, supervising, or certifying any elections under the 2021 Redistricting Plan boundaries until a constitutionally compliant remedial plan is adopted elections beginning in 2024;

54

5.      Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the current configuration of Arkansas's U.S. congressional districts until a constitutionally compliant remedial plan is adopted for elections beginning in 2024;

6.      Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for congressional districts in Arkansas;

7.      Retain jurisdiction over this matter until Defendants enact a compliant plan by this Court's deadline;

8.      Retain jurisdiction over this matter for such period it deems appropriate and require Defendants to submit future legislative redistricting plans, including congressional plans, for preclearance review from this Court or the United States Attorney General pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c);

9.      Make all further orders as are just, necessary, and proper to ensure complete relief consistent with this Court's orders;

10.     Award Plaintiffs reasonable attorneys' fees and costs in this action; and

11.     Grant such other and further relief as this Court deems just and proper in the circumstances.

Respectfully submitted,

Dated: May 23, 2023

Leah C. Aden*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Fl.
NY, NY 10006
Tel.:  (212) 965-7715
laden@naacpldf.org

Michael Skocpol*
Joseph Wong*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St, Ste. 600
Washington, D.C. 20005
Tel.:  (202) 682-1300
mskocpol@naacpldf.org
jwong@naacpldf.org

Arkie Byrd, Arkansas Bar No. 80020
MAYS, BYRD & ASSOCIATES, P.A.
212 Center Street, Suite 700-A
Little Rock, AR 72202
Tel.: (501) 372-6303
Fax: (501) 399-9280
Abyrd@maysbyrdlaw.com

Daniel Bookin*
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Fl.
San Francisco, CA 94111
Tel.: (415) 984-8786
dbookin@omm.com

Ashley Pavel*
O'MELVENY & MYERS LLP
610 Newport Center Dr., 17th Fl.
Newport Beach, California 92660
Tel.:  (949) 823-7138
apavel@omm.com

*Motion for admission Pro Hac Vice forthcoming*

*Counsel for Plaintiffs Christian Ministerial
Alliance, Patricia Brewer, Carolyn Briggs, Lynette
Brown, and Mable Bynum*