# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

CHRISTIAN MINISTERIAL ALLIANCE, *et al.*,　　　　　　　　　　　　PLAINTIFFS,

v.　　　　Case No. 4:23-cv-00471-DPM-DRS-JM (three-judge court)

JOHN THURSTON, *et al.*,　　　　　　　　　　　　　　　　　　DEFENDANTS.

**Defendants' Brief in Support of Motion to Dismiss**

TABLE OF CONTENTS

Introduction ................................................................................................................... 1
Background .................................................................................................................. 1
Legal Standard ............................................................................................................. 6
Argument ..................................................................................................................... 7
    I.   Sovereign immunity bars Plaintiffs' claims against the Election
        Commissioners because they are not proper *Ex parte Young* Defendants. .......... 7
    II.  Plaintiffs fail to plausibly allege that the General Assembly engaged in
       intentional racial discrimination in adopting the 2021 congressional map. ......... 8
        A.  Plaintiffs' equal protection claims fail because they have not plausibly
            alleged intentional discrimination. ................................................................ 8
        B.  The Fifteenth Amendment does not support Plaintiffs' vote-dilution
            claim. ............................................................................................................ 12
Conclusion ................................................................................................................. 14

## INTRODUCTION

Redistricting is "a most difficult subject." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It "is the politics of politics," and it rarely leaves everyone (or perhaps anyone) happy. *Thomas v. Bryant*, 938 F.3d 134, 175 (5th Cir. 2019) (Willett, J. dissenting), *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020). It is because districting decisions are so steeped in politics and intensely local considerations that it "is primarily the duty and responsibility of the State through its legislature or other body, rather than a federal court." *Chapman v. Meier*, 420 U.S. 1, 27 (1975).

The Plaintiffs here fought a political battle and lost. They are dissatisfied with the results of the Arkansas General Assembly's redrawing of the State's congressional districts following the 2020 Census. A previous set of plaintiffs fought a legal battle against the congressional map and lost—twice. This Court reviewed the factual background surrounding the adoption of the congressional map and concluded that the allegations failed to meet even the minimum requirements to proceed in federal court on an equal-protection challenge.

The allegations here are the same. There is nothing in Plaintiffs' Complaint that this Court has not already seen, analyzed, and found wanting. In fact, the factual allegations here are more bereft of detail than those in the first lawsuit. This Court should dismiss Plaintiffs' Complaint with prejudice.

## BACKGROUND

This case involves challenges to modest revisions to Arkansas's four congressional districts. State law provides that the General Assembly is responsible for reapportioning congressional districts after the Census. *See* Ark. Code Ann. 7-2-101 *et seq*. Following the receipt of official census data last fall, the General Assembly reconvened in September to consider reapportionment legislation. (Compl. ¶¶ 16-17.)

Reapportionment is required to comply with the constitutional requirement that the populations of a state's congressional districts be as equal "as is practicable." *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964). This is sometimes referred to as the "one person, one vote" rule. Based on the 2020 census, each of Arkansas's congressional districts "needed an ideal population of 752,881." (Compl. ¶ 53.) Due to population growth in the Second and Third Districts, the General Assembly was required to rebalance the population between Arkansas's existing districts in order to comply with the one person, one vote rule. (Compl. ¶¶ 52-54.) This meant redrawing boundaries to significantly reduce the population of the Third District; substantially reduce the population of the Second District; and increase the populations of the First and Fourth Districts. In addition to drawing districts that met the one person, one vote requirement, the General Assembly also aimed—consistent with judicial precedent—to draw districts that were compact, contiguous, minimized splits between political subdivisions (like counties), preserved communities of interest, avoided pairing incumbents, and otherwise complied with federal law. (Compl. ¶ 148.)

In that process, the General Assembly considered a number of maps and eventually settled on House Bill 1982 and Senate Bill 743, which were enacted as Acts 1114 and 1116. (Compl. ¶¶ 88-89.) The Acts were adopted on October 7, 2021, and the new congressional map became effective on October 13, 2021. (Compl. ¶ 93.)

The new districts adopted by the General Assembly differed little geographically from the 2011 maps. (*See* Compl. ¶¶ 94-95.) In both maps, the First District comprises the counties in the eastern and northern part of the state; the Second District is made up of central Arkansas counties; the Third District is toward the northwest; and the Fourth District comprises the remaining counties, mostly in the southern and western parts of the state. (*Id.*)

2

The only substantial difference between the previous and current maps is that the current map reduces the number of county splits. Minimizing splits of political subdivision boundaries—such as counties—is an important redistricting principle for a number of reasons, including lessening the burden on election officials creating ballots and keeping together communities of shared interests. (*See* Compl. ¶21.) As Plaintiffs note, there was "common agreement" between members of the General Assembly "that county splits should be avoided." (Compl. ¶ 75.)

The pre-existing 2011 congressional map split a total of five counties: Crawford, Newton, Searcy, and Sebastian, all of which are in the northwest portion of the state, and Jefferson County, one of the State's minority population centers. (Compl. ¶ 94.) By contrast, the 2021 map splits only two counties. Sebastian County remains split between Districts 3 and 4, with slightly different boundaries, and Pulaski County is split between Districts 1, 2, and 4. (Compl. ¶ 95.) Pulaski and Sebastian are the State's largest and fourth-largest counties by population, respectively. Pulaski County, in addition to being the State's most populous county, is located in the geographic center of Arkansas and shares a boundary with six other counties. (*Id.*) Sebastian County is located along the western edge of the state, near Benton and Washington Counties, Arkansas's second and third most populous counties. These factors make it difficult for a map drawer to avoid splitting Sebastian or Pulaski Counties without incurring a substantial number of splits elsewhere, as was the case with the 2011 congressional map. Moreover, Pulaski County is the only populous county within the Second District that shares a border with more than one congressional district (Van Buren County, which shares a border with the First and Third Districts, is a rounding error in comparison to Pulaski's population). (Compl. ¶ 95.)

Particularly relevant here is the lack of any allegations by Plaintiffs that the adjustments from 2011 to 2021 significantly changed the Second District's racial demographics. Indeed,

3

while Plaintiffs make much of State Senator Joyce Elliott's 10-point loss in the 2020 election for the Second District (Compl. ¶¶ 68-73), insinuating that it served as an impetus for splitting Pulaski County, they don't even disclose what the actual changes were to the demographic makeup. Yet what Plaintiffs do allege makes it apparent that the difference would not make a real dent in any electoral context. 41,392 total residents (not voters) in southeastern Pulaski County were moved; the voting-age population of the portion going to the First District is 57% black, those going to the Second District only 50%. (Compl. ¶¶ 134, 136.) In a district with an ideal population of 752,881, those changes are insignificant.

In addition to reducing the number of county splits in line with the General Assembly's stated goal, the 2021 congressional districts are also more compact. Indeed, the 2021 map eliminated the elongated and oddly shaped upside-down "U" that previously constituted the Third District. (Compl. ¶ 94.) It also largely kept the shape and borders of the previous map. *See Cooper v. Harris*, 581 U.S. 285, 338 (2017) (Alito, J. concurring in the judgment in part and dissenting in part) ("When a new census requires redistricting, it is a common practice to start with the plan used in the prior map and to change the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends.").

*Procedural History*

Despite much press attention and rigamarole from various interested parties (*e.g.*, Compl. ¶¶ 86, 125, 126), no plaintiff sued to block the use of the current maps for the 2022 election cycle. In fact, a federal challenge was not brought until March 7, 2022, nearly five months after the congressional map became effective. *Simpson v. Hutchinson*, Case No. 4:22-cv-00213-JM (E.D. Ark.) (three-judge court). This was long after any relief would have been possible for

4

the next election. *See Merrill v. Milligan,* 142 S. Ct. 879, 881 (2022) (staying injunction of Alabama's congressional districts on the ground that the election was too close for court intervention on February 7, 2022).

The factual basis for that case is the same as here. The *Simpson* plaintiffs alleged that the General Assembly's decision to split portions of Pulaski County into different districts—a decision that resulted in near-perfect population equality as well as a reduction in the total number of county splits—was motivated by race. They relied on the same allegations as in this case: the southeastern portion of Pulaski County that was split is more minority-heavy than the rest of the district; detractors warned the map's supporters of what they predicted would be adverse racial impacts; and the General Assembly did not agree with them and passed the map anyway. There is no indication that the legislators who voted for the map were motivated by race, and opposing legislators didn't accuse them of having racial motives. Nevertheless, the plaintiffs asked this Court to infer from this total absence of evidence a discriminatory purpose on the part of the General Assembly.

This Court dismissed those claims, concluding that they failed to allege facts supporting a plausible inference that race was a predominant motive in the General Assembly's adoption of the 2021 map but granted the *Simpson* plaintiffs leave to amend. *See Simpson v. Hutchinson*, 2022 WL 14068633 (E.D. Ark. Oct. 24, 2022) (*Simpson I*). The amended complaint in *Simpson* fared no better, and dismissal with prejudice followed. *Simpson v. Hutchinson*, 2023 WL 3993040 (E.D. Ark. May 25, 2023) (*Simpson II*). Defendants now ask this Court to again dismiss for failure to state a claim.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of claims that "fail[] to state a claim upon which relief can be granted" by motion. Under that rule, a complaint's factual allegations are accepted as true and viewed in the light most favorable to the plaintiff. *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999) (citing *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999)). "At a minimum, however, a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations." *Id.* (quoting *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998)). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And, as here, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Rule 12(b)(6) dismissals are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In other words, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to "show[] that the pleader is entitled to relief" under Federal Rule of Civil Procedure 8(a)(2) and must be dismissed. *Id.* at 679.

Applying that standard, this Court should dismiss Plaintiffs' Complaint with prejudice.

## ARGUMENT

**I.     Sovereign immunity bars Plaintiffs' claims against the Election Commissioners because they are not proper *Ex parte Young* Defendants.**

This Court lacks jurisdiction over the Election Commissioners because they are immune from suit under the Eleventh Amendment. They have no connection to the enforcement of state law establishing Arkansas's congressional districts and are therefore improper defendants. Plaintiffs' claims against them must be dismissed.

Under *Ex parte Young*, a "state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged laws"). "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt 'to make the state a party.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

Plaintiffs do not allege that the Election Commissioners have any specific role in administering or enforcing the use of the congressional districts approved by the General Assembly. Instead, as Plaintiffs recognize, "Secretary Thurston is Arkansas's chief election official and is responsible for administering and directing the state's elections and implementing election laws and regulations, including the 2021 Redistricting." (Compl. ¶ 34 (citing Ark. Const. amend. 51, sec. 5).) The responsibility of conducting elections using the congressional maps approved by the General Assembly thus falls to the Secretary of State, not the Election Commissioners.

7

In support of their inclusion of the Election Commissioners as defendants in this suit, Plaintiffs cite a provision of the Board's Rules that notes that the General Assembly "has empowered the board to enforce election laws and has delegated to the board the authority to promulgate rules to assure even and consistent application of *voter registration laws and fair and orderly election procedures*." Admin. Code 108.00.11-1101(2) (emphasis added). That doesn't give the Election Commissioners any power over the congressional maps, and neither does the Board's governing statutory provision. *See* Ark. Code Ann. 7-4-101(f) (listing the powers of the Board). The primary responsibilities of the Election Commissioners are training election workers and ensuring "even and consistent application of voter registration laws and fair and orderly election procedures." Ark. Code Ann. 7-4-101(f)(5). These "procedures" are the "administrative duties of the election process," primarily carried out in the first instance by county officials—not the line-drawing of district maps. The congressional maps are set by statute and implemented by the Secretary of State.

Plaintiffs can obtain complete relief in this case with only Secretary Thurston as a defendant, just as in *Simpson*. The Election Commissioners should be dismissed.

**II.    Plaintiffs fail to plausibly allege that the General Assembly engaged in intentional racial discrimination in adopting the 2021 congressional map.**

    **A.    Plaintiffs' equal protection claims fail because they have not plausibly alleged intentional discrimination.**

Plaintiffs' equal protection claims fail as a matter of law because they have failed to allege that Arkansas's congressional map was predominantly motivated by race. This was true in *Simpson*, and it is true here.

"Proof of racially discriminatory intent or purpose is required to show a violation of the [federal] Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Where plaintiffs allege racial gerrymandering, "the burden of proof on the

8

plaintiffs . . . is a demanding one." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). To prevail, a plaintiff must prove that race was not simply "*a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Id.* (citation and internal quotation marks omitted). Because of (1) the "evidentiary difficulty" of distinguishing "between being aware of racial considerations and being motivated by them," (2) "the sensitive nature of redistricting," and (3) "the presumption of good faith that must be accorded legislative enactments," courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

In assessing legislative intent, courts are often guided by the *Arlington Heights* factors: (a) the discriminatory "impact of the official action," and "whether it 'bears more heavily on one race than another,'" (b) the "historical background," (c) the "specific sequence of events leading up to the challenged decision," (d) departures from procedure and substance, and (e) the "legislative or administrative history," including any "contemporary statements" of legislators. *Arlington Heights*, 429 U.S. at 266-68 (citations omitted).

Applying those standards, Plaintiffs fail to plausibly allege an equal protection violation. Their allegations are the same as those rejected by this Court in *Simpson*. First is what was said about the map. As did the *Simpson* plaintiffs, the Complaint here recites various criticisms levelled by opponents of the map, both during the legislative process and after its passage. (*See* Compl. ¶¶ 86, 97, 110-119, 125-26.) But none of these conclusory statements claim any special knowledge of the motivations of the legislators who voted for the congressional map, nor do they claim that the legislature intentionally discriminated based on race. *See Simpson I*, 2022 WL 14068633 at *3 (noting the absence of allegations that either Governor Hutchinson or Little Rock Mayor Frank Scott "worked with the General Assembly on reapportionment or otherwise knew

9

why it selected one map over the other" and that "both spoke about the map's effects, not the purpose behind it"). Even if they had, "the speculations and accusations" of a law's opponents "do not support an inference of . . . racial animus." *Butts v. City of New York*, 779 F.2d 141, 147 (2d Cir. 1985).

Next, is what *was not* said. Plaintiffs ask the Court "to draw a negative inference from the absence of racially charged rhetoric" on the part of the map's proponents. *Simpson II*, 2023 WL 3993040, at *2. Plaintiffs deride the legislators because they claim the members "largely refused to engage" with race-related criticisms brought by detractors. (Compl. ¶ 120.) Members "refused to address" what Plaintiffs describe as "valid concerns" about racial impact. (Compl. ¶ 121.) Finally, as in *Simpson*, Plaintiffs criticize members for their expressed belief that considering race in drawing the congressional maps is improper. (Compl. ¶ 122.)

But as this Court said of those same allegations in *Simpson*, "This argument does not work." *Simpson II*, 2023 WL 3993040, at *2. This Court must "presume that the General Assembly acted in 'good faith.'" *Id.* (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). So even if legislators were "aware of race when they drew the district lines," courts "cannot simply leap to the conclusion that they were lying about their motives." *Id.* (cleaned up). To be sure, opponents of the map expressed their concerns over what they believed would be a racial impact; "[b]ut mere awareness" of such an impact "is not enough." *Simpson I*, 2022 WL 14068633, at *3. To plausibly establish that race was the predominant motive, Plaintiffs must allege facts "showing that the General Assembly selected or reaffirmed a particular course of action at least in part because of its impact on" black Arkansans. *Id.* (cleaned up). As in *Simpson*, Plaintiffs' Complaint here contains no such showing.

Plaintiffs also claim that the General Assembly "departed from its normal substance and procedure" in enacting the 2021 map. (Compl. ¶ 199.) They focus on the fact that the map split counties after members had expressed that they would like to avoid doing so, (Compl. ¶ 200-01), and they claim the map was "rushed through" (Compl. ¶ 202). But as this Court held in rejecting that same claim in *Simpson*, "the brevity of the legislative process" cannot, on its own, "give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Simpson II*, 2023 WL 3993040, at *2 (cleaned up). And "even assuming the General Assembly departed from the normal procedural sequence during the redistricting process, nothing suggests that it did so to accomplish a discriminatory goal." *Id.* (cleaned up).

Plaintiffs also claim that Arkansas's history of racial discrimination justifies an inference that the General Assembly discriminated based on race in adopting the 2021 map. (Compl. ¶¶ 205-14.) This Court has already rejected this argument too, noting that "a history of discrimination fails to establish discriminatory intent, at least when it is not reasonably contemporaneous with the adoption of the new map." *Simpson II*, 2023 WL 3993040, at *2 (cleaned up). And Plaintiffs identify no such contemporaneous discrimination.

Finally, there is the map itself. To balance the population between the First, Second, and Fourth Districts, the General Assembly split Pulaski County in the Southeastern section along the border shared between those three congressional districts. (Compl. ¶ 95.) Plaintiffs allege that the voting-age population that was moved from the Second to the Fourth District is 50% black, while the portion moved to the First is 57% black. (Compl. ¶ 136.) As this Court previously concluded, even if one believed that this is "consistent with racially motivated redistricting, it does not plausibly establish this purpose on its own." *Simpson I*, 2022 WL 14068633, at *3

11

(cleaned up).  That is because it ignores "obvious alternative explanations" for the decision to split Pulaski County such as "achieving numerical equality between the districts" or gerrymandering "designed to bolster the Republican Party's electoral prospects across Arkansas," either of which "make a predominant racial motive implausible."  *Simpson II*, 2023 WL 3993040, at *2 (cleaned up).

Ultimately, Plaintiffs' Complaint recites the same allegations that this Court deemed insufficient in *Simpson*.  The same result should follow here: This Court should dismiss the Complaint.

      **B.**      **The Fifteenth Amendment does not support Plaintiffs' vote-dilution claim.**

Plaintiffs' second claim is that the General Assembly violated the Fifteenth Amendment in revising Arkansas's congressional districts.  But a claim under the Fifteenth Amendment is not cognizable here because Plaintiffs' "freedom to vote has not been denied or abridged by anyone"; that is, they do not claim that they are unable to "register and vote without hindrance." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980)); *see Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("When a legislative body is apportioned into districts, every citizen retains equal rights to vote for the same number of representatives, even if not for all of them, and every citizen's ballot is equally weighed.").

Rather, they seek to bring a vote-dilution claim under the Fifteenth Amendment.  The Supreme Court has never held that such a claim exists.  *See Bossier Parish Sch. Bd.*, 528 U.S at 334 n.3 ("W[e] have never held that vote dilution violates the Fifteenth Amendment . . . [and] we have never even 'suggested' as much.") (internal citations and quotations omitted).  Indeed, the Supreme Court has "never [] held any legislative apportionment inconsistent with the Fifteenth

Amendment." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993). Plaintiffs' claims are no different than those rejected by the Supreme Court.

To be sure, as this Court previously recognized, the Eighth Circuit has broken with the Supreme Court and recognized Fifteenth-Amendment vote-dilution claims. *See Simpson I*, 2022 WL 14068633, at *4 (citing *Perkins v. City of West Helena*, 675 F.2d 201, 205-06 (8th Cir. 1982)). In the previous version of this case, the Court ultimately declined to reach the issues of whether *Perkins* is binding on a three-judge court or whether it correctly interpreted the Fifteenth Amendment. *Id.* That's because even under *Perkins*, claims under the Fourteenth and Fifteenth Amendments "have the same elements," *id.*, and the plaintiffs' Fourteenth Amendment claims there failed for the reasons explained above. *Simpson II*, 2023 WL 3993040, at *2. This Court should do the same here since—as explained above—Plaintiffs' claims fail on the merits for the same reasons. *See Simpson I*, 2022 WL 14068633, at *4; *see also Simpson II*, 2023 WL 3993040, at *1 n.1. This Court should dismiss the Complaint with prejudice.

.

13

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General
NICHOLAS J. BRONNI (2016097)
  Solicitor General
DYLAN L. JACOBS (2016167)
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
(501) 682-2591 (fax)
Dylan.Jacobs@arkansasag.gov

*Counsel for Defendants*