IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CHRISTIAN MINISTERIAL ALLIANCE, *et al.*,                                   PLAINTIFFS,

v.        Case No. 4:23-cv-00471-DPM-DRS-JM (three-judge court)

JOHN THURSTON,                                                              DEFENDANT.

**Defendant's Reply in Support of Motion to Dismiss Amended Complaint**

**TABLE OF CONTENTS**

Introduction ........................................................................................................................ 1

Argument ........................................................................................................................... 1

    I.   Racial vote-dilution claims require plaintiffs to plausibly allege that race was the predominant factor motivating the legislature's districting decision. ...................... 1

    II.  Plaintiffs' equal protection claims fail because they have not plausibly alleged intentional discrimination. ........................................................................ 3

        A.  The Second District's configuration itself does not plausibly suggest racial motives. ................................................................................................ 3

        B.  Plaintiffs' other allegations do not create a plausible inference of racial intent. ........................................................................................................ 8

    III. Plaintiffs' Fifteenth Amendment vote-dilution claim fails because they have not plausibly alleged intentional discrimination. ...................................... 10

Conclusion ...................................................................................................................... 12

**INTRODUCTION**

In *Simpson v. Thurston*, a different set of plaintiffs claimed that the Arkansas General Assembly's decision to equalize the State's congressional districts' population by moving a small fraction of Pulaski County voters from the Second District was a racial gerrymander. This Court held they did not even plausibly allege racial intent, concluding that compliance with the one-person, one-vote rule and partisan motives were more obvious explanations for the transfer. Here, Plaintiffs attack the same transfer on the same theories. Unsurprisingly, they too fail to plausibly allege racial intent.

Plaintiffs see it differently, contending that because they have alleged a little more about the new districts' demographics than the *Simpson* plaintiffs (while alleging less about the legislature's partisan motives), they have succeeded where the *Simpson* plaintiffs failed. But Plaintiffs' allegations of the slight difference in the new districts' demographics—just a 2% reduction in the Second District's 22% black voting-age population—only make their claims of racial intent less plausible. And even though Plaintiffs have taken pains to omit any discussion of party politics from their complaint, partisan advantage and incumbency protection are still far more obvious explanations for the county split Plaintiffs attack. This Court should dismiss Plaintiffs' Amended Complaint.

**ARGUMENT**

**I.  Racial vote-dilution claims require plaintiffs to plausibly allege that race was the predominant factor motivating the legislature's districting decision.**

Plaintiffs begin by arguing that to plead an intentional vote-dilution claim, as opposed to a racial-gerrymandering claim, they need only allege that "discriminatory intent was *a* 'motivating factor'" in the drawing of the Second District, Pls.' Resp. 6 (emphasis added), "not that it was the 'predominant' factor," *id.* Plaintiffs fail to state a claim under either standard. But in

1

arguing the predominant-factor standard doesn't apply to their vote-dilution claim, Plaintiffs don't acknowledge that this Court twice held the contrary in *Simpson*. The plaintiffs there too made "vote-dilution claims." *Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 955 (E.D. Ark. 2022) ("*Simpson I*"); *see also Simpson v. Thurston*, No. 4:22-cv-213, 2023 WL 3993040, at *1 (E.D. Ark. 2023) ("*Simpson II*") ("The plaintiffs' theory . . . is the same as before: vote dilution."). And this Court held that in "[t]hese types of claims . . . not just any discriminatory purpose will do. Rather, race must be the '*predominant* factor.'" *Simpson I*, 636 F. Supp. 3d at 955 (quoting *Easley v. Cromartie*, 532 U.S. 234, 241 (2001)); *see also Simpson II*, 2023 WL 3993040, at *1.

This Court was right then. In *Miller v. Johnson*, the Supreme Court explained, in announcing the predominant-factor rule, that courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." 515 U.S. 900, 916 (1995). A mere mixed-motive standard was insufficiently deferential, the Court reasoned, because—among other things—legislatures will "almost always be aware of racial demographics," *id.*; because of "the evidentiary difficulty" that would ensue were mixed motives sufficient, *id.*; and because "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions" and "States must have discretion to exercise the political judgment necessary to balance competing interests," *id.* Those rationales apply with equal force whether a claim is labeled racial gerrymandering or intentional vote dilution. And if Plaintiffs were correct, any racial gerrymandering claim could be recast as an intentional vote dilution claim, and thereby evade the burden to prove predominant motive.

The only controlling authority Plaintiffs claim is to the contrary is *Rogers v. Lodge*, 458 U.S. 613 (1982). Pls.' Resp. 6. But *Rogers* predates *Miller*'s adoption of the predominant-motive standard. And though it cited *Arlington Heights* regarding the types of *evidence* used to

2

show intentional discrimination, *id.* at 618—as did *Miller* and this Court in *Simpson*—it did not apply *Arlington Heights*' mixed-motive framework.  Instead, it held the court below in that case applied the correct legal standard for intentional discrimination because it asked "whether the districting plan under attack exists *because* it was intended to diminish or dilute the political efficacy of [a racial] group."  *Id.* at 621 (emphasis added).  This Court was right in *Simpson*: Plaintiffs must "allege facts creating a plausible inference that race was the '*predominant* factor' in the redistricting process."  *Simpson II*, 2023 WL 3993040, at *1 (quoting *Easley*, 532 U.S. at 241).

II.     **Plaintiffs' equal protection claims fail because they have not plausibly alleged intentional discrimination.**

    A.     **The Second District's configuration itself does not plausibly suggest racial motives.**

Whether Plaintiffs had to plausibly allege that race was the predominant factor motivating the modified boundaries of the Second District, or only that race was a motivating factor, Plaintiffs have not plausibly alleged intentional discrimination.  Plaintiffs principally argue that racial intent is "evident on the face of the plan itself."  Pls.' Resp. 8.  On their telling, the General Assembly removed black voters from the Second District with "laser precision" and "surgical targeting."  *Id.*

Yet shorn of the colorful descriptors, what Plaintiffs actually allege is a shift in the Second District's racial composition so minute as to be hardly worth mention.  Before the redistricting plan, the black voting-age population of the Second District was 22.6%.  *Id.* (citing Am. Compl. 16 ¶ 64).[1]  After the plan, it was 20.4%—just 2.2% less.  (Am. Compl. 34-36 ¶¶ 143-

---

[1] Plaintiffs did not allege that percentage in their complaint, but derive it from the total voting-age population numbers, which they did allege.

46.[2]) And that small diminution in the black voting-age population was hardly effectuated by a "laser targeting" of the 2% that were drawn into other districts. Rather, the plan simply moved the bulk of southeastern Pulaski County—in two unremarkably shaped parts—to the First and Fourth Districts. (Am. Compl. 32 ¶ 132.) Those transfers did not "target" black voters any more than they targeted non-black voters; the section of Pulaski County moved to the Fourth District had a 50% black voting-age population, and the section moved to the First District had a 57% black voting-age population. (Am. Compl. 32 ¶ 136.) In other words, almost as many non-black Pulaski County voters were drawn into other districts as black Pulaski County voters. In fact, the majority of the precincts with the highest concentration of black voters were left in the Second District, while two large precincts with only a 10% to 20% black population were drawn into the Fourth District—the opposite of what one would expect if line-drawers were "targeting" black voters for exclusion. (Am. Compl. 33 ¶ 144.)

Nothing about this slight shift in the Second District's demographics should raise an eyebrow—even before considering the obvious alternative explanations to Plaintiffs' for the shift. Plaintiffs argue that the demographics of a district themselves can be evidence of racial gerrymandering. Pls. Resp. 8. But in the cases they cite where courts relied, even in part, on demographics, line-drawers hit transparently racial targets in a transparently racial way. For example, in *Cooper v. Harris*, 581 U.S. 285 (2017), an allegedly racially gerrymandered district's black voting-age population made "a sizable jump" from under 44% to over 50% —a target line-

---

[2] Plaintiffs avoid making this self-defeating allegation directly, but allege it nonetheless, as follows: under the new plan black voters are largely "distribut[ed] . . . across the First, Second and Fourth Districts" (Am. Compl. 33 ¶ 143); "Black voters comprise at least 16.9% of the VAP in [those] three different districts, but do not exceed 20.4% of the VAP in any of them" (*id.* 35 ¶ 146); the black voting-age population in the First District is now 16.9% (*id.* 34 ¶ 144); the black voting-age population in the Fourth District is now 19.8% (*id.* 34 ¶ 145).

4

drawers often pursue in the name of Voting Rights Act compliance. *Id.* at 310. And to make that jump, the state drew lines in a manner obviously traceable to race, capturing, for example, 65% of the black registered Democrats in the district's region, but only 18% of the region's white registered Democrats. *See id.* at 315. In another case Plaintiffs cite, line-drawers seeking to maintain or surpass an underpopulated district's 72% black population added over 15,000 residents to the district, only 36 of whom were white. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 260, 275 (2015).

Here, by contrast, neither the ultimate composition of the Second District nor the demographics of the voters drawn into other districts in the 2021 plan suggest a racial focus or discriminatory intent. Unlike the homogenous populations line-drawers sought to include or exclude in *Cooper* and *Alabama Legislative Black Caucus*, the precincts drawn out of the Second District were racially *heterogeneous*—approximately 50% black and 50% non-black. And unlike those cases, where line-drawers strived to hit a transparently racial target, here the General Assembly inherited an overpopulated district with an approximately 20% black minority and redrew it with an approximately 20% black minority.

Indeed, Plaintiffs barely offer a comprehensible explanation, much less a plausible one, of how a mere 2% reduction in an already small minority population suggests racial intent. The closest they come is the suggestion that the legislature moved to prevent black voters from electing their preferred candidate after a black Democrat lost the Second District in 2020 by nearly 11%. Pls.' Resp. 17 (citing Am. Compl. 18 ¶ 73). But even if it were plausible that the legislature reacted to that hardly narrow defeat—and even if reducing the district's black population by just 2% were plausibly a response to it—that suggests a partisan motive, not a racial one. Any victory for a Democrat in the Second District would have required broad support from a coalition

5

of black *and* white Democrats, and efforts to hinder their preferred candidates' prospects are far more plausibly understood as efforts to diminish *that partisan coalition*'s political power, not to hinder the preferences of its black members alone.

Not only doesn't the slight change in the Second District's demographics "create[e] a plausible inference that race was the *predominant* factor in the redistricting process," *Simpson II*, 2023 WL 3993040, at *1, there are obvious alternative explanations that are far more plausible. The most obvious is equalizing population. By 2021, the Second District was overpopulated, while the First and Fourth Districts were underpopulated. (Am. Compl. 14 ¶¶ 52-54.) A net total of "16,510 persons needed to be moved out of the Second District during the 2021 Redistricting in order to comply with the equal-population requirements of the Constitution." (Am. Compl. 15 ¶ 55.) Pulaski County was the only large county in the Second District that shared a border with both the First and Fourth Districts. (Am. Compl. 22 ¶ 94.) Thus, the only way to reduce the Second District's overpopulation and cure the First and Fourth Districts' underpopulation without splitting multiple counties was reallocating parts of Pulaski County. And the parts of Pulaski County that bordered the First and Fourth Districts were its eastern and southern borders—precisely the parts drawn into the First and Fourth Districts, respectively. (Am. Compl. 22-23 ¶¶ 94-95.)

Recognizing these facts, Plaintiffs do not really dispute that it was necessary to split Pulaski County in the area it was split to equalize the Second District's population. Instead, they merely argue it was not necessary to split quite so much of Pulaski County. They point out that the General Assembly moved over 41,000 voters from Pulaski County though it only needed to move a net total of 16,500, Pls.' Resp. 23 (citing Am. Compl. 32 ¶ 134), and that it made up for

6

the excess by transferring a predominantly white county, Cleburne County, into the Second District, *id.* at 9 (citing Am. Compl. 1 ¶ 2, 49 ¶ 204). That, they claim, suggests that the transfer of Pulaski County voters was motivated by race, not equalizing population. But here too, equalizing population is an obvious alternative explanation. As Plaintiffs allege, by the 2020 census the Third District was also overpopulated. (Am. Compl. 14 ¶ 52.) That necessitated the transfer of multiple counties in northwest Arkansas from the Third District to the underpopulated First District. (*Compare* Am. Compl. 22 ¶ 94 *with* Am. Compl. 23 ¶ 95.) But the transfer of that population, in turn, overpopulated the First District. So to equalize the First District's population, the General Assembly moved Cleburne County from the First to the Second, which was the only district Cleburne County neighbored. (*Id.*)

Plaintiffs' own allegations also point to another obvious alternative explanation for the Pulaski County split: incumbency and partisanship. As noted above, Plaintiffs' theory of the General Assembly's supposed racial motive is that the legislature reacted to State Senator Joyce Elliott's "close" (really almost 11-point) loss to the Second District's Republican incumbent by removing a portion of her supporters. Pls.' Resp. 17 (citing Am. Compl. 18 ¶ 73). Yet if that were the impetus for the Pulaski County split, the far simpler explanation is an effort to protect the incumbent and Republican partisan advantage more generally—not to frustrate the preferences of black voters *qua* black voters.

Plaintiffs disagree. They counter that a purely racial motive is more plausible because of their vague allegation that white Democrats were included in the Second District at a "notably higher rate" than black Democrats. *Id.* at 21 (citing Am. Compl. 46 ¶ 189). But that differential does not make the partisan explanation any less plausible. As Plaintiffs allege, Pulaski County's black voting-age population "predominantly lives in the southern and eastern portions of the

7

county." (Am. Compl. 16 ¶ 60.)  And it is those portions that bordered the First and Fourth Districts (Am. Compl. 22 ¶ 94), while the sections of Pulaski County that did not border those districts are "predominantly white" (Am. Compl. 16 ¶ 60).  So any line-drawer seeking to move a number of Democratic voters out of the Second District would inevitably have removed a somewhat larger share of black Democrats than white Democrats.

      **B.**      **Plaintiffs' other allegations do not create a plausible inference of racial intent.**

Plaintiffs' other arguments that their allegations create a plausible inference that race motivated the Second District's composition merit less response, particularly as this Court addressed essentially identical allegations in *Simpson*.

First, Plaintiffs claim the new Second District departs from traditional redistricting principles by splitting several political subdivisions in Pulaski County, and that that departure evinces racial intent.  Pls.' Resp. 12-14.  Yet Plaintiffs admit the new plan as a whole actually splits three fewer counties than the previous redistricting plan: just two to the 2011 plan's five.  *Id.* at 13 n.3 (citing Deft.'s Br. in Supp. of Mot. to Dismiss 3).  So the fact that the current plan splits some political subdivisions is unremarkable.  Any plan, in order to equalize population, had to split some counties and political subdivisions, and by opting to split the state's most populous county and geographic center, the General Assembly minimized the total number of split subdivisions in the plan as a whole.

Second, Plaintiffs argue that because the plan's proponents were "warned" that the plan would "harm Black voters' electoral opportunities" by the plan's opponents, it is plausible that the plan was adopted in order to harm black voters' electoral opportunity.  Pls.' Resp. 10; *see also id.* at 18-20.  Relatedly, Plaintiffs suggest it is suspect that in response, the plan's proponents said it would be inappropriate to consider race.  *See id.* at 10-11.  This Court addressed the

8

same sorts of criticisms in *Simpson*, and explained that the criticisms "of a law's opponents do not support an inference of racial animus." *Simpson II*, 2023 WL 3993040, at *1 (alterations omitted) (internal quotation marks omitted) (quoting *Butts v. City of New York*, 779 F.2d 141, 147 (2d Cir. 1985)). And the Court addressed the same sort of "negative inference from the absence of racially charged rhetoric" on the plan's supporters' part, and refused to "leap to the conclusion that [legislators] were lying about their motives." *Id.* at *2.

Plaintiffs' inferences are especially inappropriate here, because—as their own allegations show—the impact on black voting strength that the plan's opponents warned of simply wasn't that great. Again, the changes in the Second District's composition reduced the district's 22% black voting-age population by only two percentage points, and even before the Second District was redrawn, black voters' preferred candidates were well shy of the support needed to carry the district. Meanwhile, the changes gave black voters a sizable voice in the First and Fourth Districts—16.9% and 19.8% respectively. Warnings of discriminatory impact can't create a plausible inference of discriminatory intent when in reality there is little discriminatory impact.

Third, Plaintiffs hark back to Arkansas's history of Jim Crow-era discrimination, which they claim supports an inference of discriminatory intent today. Pls. Resp. 15-16. This Court rejected that inference in *Simpson*, explaining that a past history of racial discrimination cannot establish discriminatory intent "when it is not 'reasonably contemporaneous' with the adoption of the new map." *Simpson II*, 2023 WL 3993040, at *2 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987)). Plaintiffs argue this Court misapplied *McCleskey* because the evidence the Supreme Court rejected as immaterial there dated back to the period just after the Civil War. Pls.' Resp. 16 n.4. But as this Court correctly recognized, *McCleskey* announced a broader principle: "unless historical evidence is reasonably contemporaneous with the challenged decision, it

9

has little probative value." *McCleskey*, 481 U.S. at 298 n.20.  The history on which Plaintiffs rely is not reasonably contemporaneous with the map adopted here.

Fourth and last, Plaintiffs claim their allegation that the plan was "rushed through" supports an inference of discriminatory intent.  Pls.' Resp. 18.  But they do not even attempt to explain the connection between a rushed process and racial discrimination.  Nor do they acknowledge that this Court held just the opposite of the same "rushed" process in *Simpson*.  The plaintiffs there also alleged that "the map 'was rushed,'" *Simpson II*, 2023 WL 3993040, at *2, and this Court responded that "'the brevity of the legislative process' cannot, on its own, 'give rise to an inference of bad faith,'" *id.* (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2328-29 (2018)).

Ultimately, Plaintiffs' Amended Complaint recites the same allegations that this Court deemed insufficient in *Simpson*.  The same result should follow here: This Court should dismiss the Complaint.

### III. Plaintiffs' Fifteenth Amendment vote-dilution claim fails because they have not plausibly alleged intentional discrimination.

Plaintiffs also assert a vote-dilution claim under the Fifteenth Amendment.  But as this Court noted in *Simpson*, the Supreme Court has "'never even suggested' that 'vote dilution violates the Fifteenth Amendment."  *Simpson I*, 636 F. Supp. 3d at 957 (quoting *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000)).  Plaintiffs note that the Eighth Circuit recognized a Fifteenth Amendment vote dilution claim four decades ago.  Pls.' Resp. 20 (citing *Perkins v. City of West Helena*, 675 F.2d 201, 205 (8th Cir. 1982)).  But they make no argument that Eighth Circuit precedent is binding on this three-judge court—a proposition that is doubtful as its decisions are only reviewable in the Supreme Court.  Nor do they respond to the view of some members of

10

this Court that *Bossier Parish*, as well as an earlier statement by the Supreme Court doubting Fifteenth Amendment vote-dilution claims' existence, "abrogated *Perkins*."  *Simpson I*, 636 F. Supp. 3d at 958.

Yet even if Fifteenth Amendment vote-dilution claims are actionable, Plaintiffs concede that the same standards that govern a Fourteenth Amendment vote-dilution claim would govern a Fifteenth Amendment one.  Pls.' Resp. 20.  And as Plaintiffs' Fourteenth Amendment vote-dilution claim fails, any Fifteenth Amendment vote-dilution claim they may have would fail too.  So as in *Simpson*, this Court need not decide whether Fifteenth Amendment vote-dilution claims are actionable.  It need only hold that even if they are actionable, Plaintiffs have failed to state one.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General
NICHOLAS J. BRONNI (2016097)
  Solicitor General
DYLAN L. JACOBS (2016167)
  Deputy Solicitor General
ASHER STEINBERG (2019058)
  Senior Assistant Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
(501) 682-2591 (fax)
Dylan.Jacobs@arkansasag.gov

*Counsel for Defendant*