IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

_____

No. 4:23-cv-471
_____

Christian Ministerial Alliance, *et al.*,

Plaintiffs,

v.

John Thurston,

Defendant.
_____

Before STRAS, Circuit Judge, MARSHALL and MOODY, District Judges.
_____

**Explanatory Order**

STRAS, Circuit Judge.

    Did Arkansas discriminate against black voters when it redrew its congressional district lines?  Although we dismissed an earlier case after twice concluding that the accusation was implausible, *see Simpson v. Hutchinson* (*Simpson I*), 636 F. Supp. 3d 951, 958 (E.D. Ark. 2022); *Simpson v. Thurston* (*Simpson II*), No. 22-cv-213, 2023 WL 3993040, at *1–2 (E.D. Ark. May 25, 2023) (per curiam), we come out differently this time.  [Doc. 35.]  This complaint, unlike the other ones, plausibly alleges that legislators chose Arkansas's map because of its discriminatory effects, not in spite of them.

I.

The 2020 census revealed that Arkansas's four congressional districts had not grown at the same rate over the previous decade. [Am. Compl. ¶ 52.] The second and third congressional districts had more people than the first and fourth, so the General Assembly had to do some reshuffling to ensure "equal representation." *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (adopting the "one person, one vote" principle). [Am. Compl. ¶¶ 52–54.] To shrink the second district, it focused on Pulaski County, home to Little Rock. [Am. Compl. ¶¶ 2, 57–58.] Although the old district lines had traced the county's border with its southern and eastern neighbors, the new map carved off the southeast corner and split it between the first and fourth districts. [Am. Compl. ¶¶ 94–95, 132.]

The southeast corner is where a sizable number of black voters lived. [Am. Compl. ¶ 130.] Although they made up less than a quarter of the total number of voters in the second district, the concentration was twice as high there. [Am. Compl. ¶¶ 64, 135–36.] The decision to split it off had the effect of dropping the black share of the overall voting-age population in the district from 22.6% to 20.4%, all but wiping out black voting-share gains from the previous census.[1] [Am. Compl. ¶¶ 64, 144–46.]

Litigation followed. First came *Simpson v. Hutchinson*, which involved claims that the new map violated the United States Constitution, the Arkansas Constitution, and the Voting Rights Act. *See Simpson I*, 636 F. Supp. 3d at 955, 958

---

[1] According to the amended complaint, between 2010 and 2020, the second district's total voting-age population increased by 40,011 to 593,620, meaning the total in 2010 was 553,609. [Am. Compl. ¶ 64.] Over the same period, the black voting-age population increased by 23,661 to 134,409, providing a starting point of 110,748. [Am. Compl. ¶ 64.] Dividing 110,748 by 553,609 gives a black share of the voting-age population of 20% in 2010, compared with 22.6% in 2020 and 20.4% under the new map. [Am. Compl. ¶¶ 64, 144–46.]

& n.2. As relevant here, we eventually dismissed because the plaintiffs were "a few specific factual allegations short" of a "plausible vote-dilution claim," even after amending their complaint. *Id.* at 958; *Simpson II*, 2023 WL 3993040, at *1.

These plaintiffs allege just two claims. One is new: a Fourteenth Amendment racial-gerrymandering claim. Their theory is that the General Assembly assigned voters to other districts *because of* their race, which itself is inherently harmful and presumptively unconstitutional. *See Miller v. Johnson*, 515 U.S. 900, 912 (1995) (discussing "the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls" (citation omitted)). [Am. Compl. ¶¶ 215–20.] The other is one we have seen before: a vote-dilution claim under the Fourteenth and Fifteenth Amendments. [Am. Compl. ¶¶ 221–25.] According to the plaintiffs, the new map "minimize[s] or cancel[s] out the voting potential" of Pulaski County's black voters. *Miller*, 515 U.S. at 911 (citation omitted); *see Simpson I*, 636 F. Supp. 3d at 955 (describing "cracking"). [Am. Compl. ¶ 223.]

With that background in mind, John Thurston, Arkansas's Secretary of State, moved to dismiss both claims. *See* Fed. R. Civ. P. 12(b)(6). After hearing oral argument, we denied the motion in a summary order but promised the parties we would explain our reasoning later. [Doc. 35.] We now do so.

II.

Racial gerrymandering and vote dilution are "analytically distinct" theories, *Miller*, 515 U.S. at 911 (citation omitted), but here they overlap. Underlying each is the idea that Arkansas discriminated against black voters when it split southeast Pulaski County voters among three districts rather than keeping them in one. The question is whether the plaintiffs' allegations plausibly show "that race was the

-3-

predominant factor motivating the legislature's decision."[2]  *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller*, 515 U.S. at 916); *Simpson I*, 636 F. Supp. 3d at 955 (applying this standard); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining the "plausibility standard").

Rarely will legislators make "[o]utright admissions of impermissible racial" discrimination.  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).  Without them, a good "starting point" is the "impact" of the new map and "whether it bears more heavily on one race than another."  *Arlington Heights*, 429 U.S. at 266.  Another potential indicator of impermissible motive is the decision-making process itself.  "Departures from the normal procedural sequence," for example, *can* suggest "that improper purposes . . . play[ed] a role."  *Id.* at 267.

A.

Taking the plaintiffs' allegations as true, the new map disproportionately "impact[s]" black voters in southeast Pulaski County, who are heavily concentrated there.  *Id.* at 266.  As the plaintiffs note, some of the trimming was unnecessary: the census showed that the second district's population exceeded the equal-population ideal by just 16,500, *see Wesberry*, 376 U.S. at 18, yet the General Assembly removed roughly 41,000 people, more than twice the amount needed.  [Am. Compl. ¶¶ 2, 54, 134.]  And then it made up the difference by moving all 25,000 residents of "overwhelmingly white Cleburne County" into the second district.  [Am. Compl. ¶¶ 2, 94–95.]  *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191–92

---

[2]The plaintiffs suggest that a less demanding "motivating factor" test applies to their vote-dilution claim.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  At this stage, given that their allegations permit a plausible inference of race-based discrimination no matter which standard we use, we need not definitively choose between them.

(2017) (explaining that "the district as a whole" is "the basic unit of analysis . . . for the racial predominance inquiry").

The complaint pleads more than just a disparate impact. Start with the description of how the General Assembly first received the new map the night before key committees were set to vote. [Am. Compl. ¶¶ 83–93.] By that time, House members had already finished ranking the other options, with the winner expected to receive an up-or-down committee vote. [Am. Compl. ¶¶ 78, 81.] Instead, the following morning, the committee replaced the highest-ranked proposal with the new map. [Am. Compl. ¶¶ 83–85.] The Senate had no last-minute swap, but it also "rushed" the new map "through the committee process." [Am. Compl. ¶¶ 18, 91.]

From these allegations, the complaint draws the conclusion that the General Assembly abandoned the "traditional race-neutral districting principle[]" of "respect for political subdivisions [and] communities defined by actual shared interests." *Miller*, 515 U.S. at 916. It had been decades, after all, since Arkansas had "crack[ed]" a single county "three[] way[s]."[3] [Am. Compl. ¶¶ 164–65.] Not to mention that the new map split Pulaski County's two largest cities, Little Rock and North Little Rock, from within. [Am. Compl. ¶¶ 171–73.] School districts, judicial subdistricts, church congregations, and neighborhoods also suffered the same fate. [Am. Compl. ¶¶ 177–87.]

---

[3]Although Arkansas emphasizes that the new map split three fewer counties than the last one [Def.'s Br. 3], the General Assembly could not just readopt the old map because it no longer complied with the "one person, one vote" rule. *Wesberry*, 376 U.S. at 18. If there is a relevant comparison here, it is to other potential maps that would have "achieve[d] an equal population goal" under the new census data. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272–73 (2015) (explaining that equalizing population "is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate").

B.

It is natural to wonder how we can come out differently from *Simpson*, given that the plaintiffs there made many of the same allegations. *See Simpson I*, 636 F. Supp. 3d at 955. As we explained then, the unequal burdens, the procedural irregularities, and the split subdivisions fell short of the plausibility line. *See id.* at 956–57. The complaint itself, after all, revealed "obvious alternative explanation[s]" for the General Assembly's decision, including partisan politics. *Id.* (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)); *see also Hunt*, 526 U.S. at 551 ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.").

Not this time. What this case has that *Simpson* did not are allegations that undercut the possibility that partisan politics were to blame for the decision. As the complaint explains, black and white voters "with the same party preferences . . . were sorted differently among the relevant districts." [Am. Compl. ¶ 22.] The new map removed black Democrats from the second district "at a notably higher rate" than white Democrats. [Am. Compl. ¶ 189.] And it did the same for black and white unaffiliated voters. [Am. Compl. ¶ 189.]

If these allegations are true, the new map appears to prioritize race over political party, creating an inference that the General Assembly treated black voters differently than white ones. *Cf. Hunt*, 526 U.S. at 548–49 (recognizing that evidence of this sort of discrepancy "tends to support an inference that the State drew its district lines with an impermissible racial motive"). Actually proving it may turn out to be a challenge, but there is enough here to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 679; *see also Cooper*, 581 U.S. at 308 (describing the "special challenges" and "sensitive inquiry" involved in "disentangl[ing] race from politics" (citation omitted)).

C.

We recognize that Arkansas has an innocent explanation for the new map: the racial effects were purely coincidental. Southeast Pulaski County, after all, is right where the first, second, and fourth districts meet, making it the natural location for reshuffling voters. [Def.'s Reply Br. 6.] Under this theory, any racial "differential" was a necessary byproduct of keeping the districts as naturally shaped as possible. [Def.'s Reply Br. 7–8.]

It may turn out that geography rather than race played the predominant role in the General Assembly's decision, but a motion to dismiss is not the time to make that call. *See Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (explaining that a "defendant is not entitled to dismissal if the facts are merely consistent with lawful conduct[,] . . . because ferreting out the most likely reason for the defendant[']s actions is not appropriate at the pleadings stage" (citations omitted)). At this point, we must construe all allegations in the plaintiffs' favor. And when we do, race becomes a plausible explanation for the decision to split southeast Pulaski County into multiple congressional districts. *See Iqbal*, 556 U.S. at 679; *cf. Cooper*, 581 U.S. at 291 n.1 (noting that legislatures cannot "use . . . race as a proxy," even if the ultimate goal is political (quoting *Miller*, 515 U.S. at 914)).

Arkansas's other counterargument is even weaker. It offers "equalizing population" as another obvious reason for the General Assembly's decision. [Def.'s Reply Br. 6.] The problem is that "equal population objectives" dictate only *how many* voters to move. *Ala. Legis. Black Caucus*, 575 U.S. at 272–73. The "'predominance' question," by contrast, "concerns *which* voters . . . to choose, and specifically whether the legislature predominantly use[d] race as opposed to other, 'traditional' factors" in making the decision. *Id.* at 273. "[E]qualiz[ing] the number of voters," in other words, can provide an explanation for why the General Assembly rejected certain maps, *Simpson I*, 636 F. Supp. 3d at 956, but must be "put to the side" when determining the main reason why the General Assembly picked *this* map

over others, *Ala. Legis. Black Caucus*, 575 U.S. at 273. *See id.* (explaining that "the requirement that districts have approximately equal populations is a background rule against which redistricting takes place[,] . . . not a factor to be treated like other nonracial factors").

### III.

There is one more loose end, but we leave it dangling for now. The plaintiffs rely on two sources for their vote-dilution claim: the Fourteenth *and* Fifteenth Amendments to the United States Constitution. [Am. Compl. ¶ 222.] As we noted in *Simpson I*, "members of this panel disagree about whether Fifteenth Amendment vote-dilution claims exist." 636 F. Supp. 3d at 957. *Compare Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) (emphasizing that the Supreme Court "ha[s] never even suggested," let alone held, "that vote dilution violates the Fifteenth Amendment" (citation omitted)), *with Perkins v. City of West Helena*, 675 F.2d 201, 205–06 (8th Cir. 1982) (holding that it does).

Arkansas flags the issue, but neither side has fully briefed it. [Def.'s Br. 10–11; Pls.' Br. 20.] So we again "set aside our disagreement . . . and simply assume" without deciding "that vote-dilution claims can come in both a Fourteenth and Fifteenth Amendment package." *Simpson I*, 636 F. Supp. 3d at 958; *accord Simpson II*, 2023 WL 3993040, at *1 n.1.

### IV.

We accordingly **DENY** the motion to dismiss.

IT IS SO ORDERED this 2nd day of February, 2024.

_____